IN THE SUPREME COURT OF TENNESSEE
AT JACKSON

November 5, 2015 Session Heard at Memphis

## DONRIEL A. BORNE v. CELADON TRUCKING SERVICES, INC.

**Appeal by Permission from the Court of Appeals**
**Circuit Court for Shelby County**
**No. CT00327310      Robert S. Weiss, Judge**

_____

**No. W2013-01949-SC-R11-CV**

_____

This appeal arises out of sequential rear-end collisions involving three tractor trailer vehicles. The plaintiff's tractor trailer was rear-ended by a tractor trailer owned by the defendant, which was in turn rear-ended by a third tractor trailer. The plaintiff sued the owners and drivers of both of the other tractor trailers, seeking compensation for personal injuries. Before trial, the plaintiff entered into an agreement with the owner of the third tractor trailer that neither would take any action adverse to the other and that the owner of the third tractor trailer would only owe the plaintiff half of any judgment entered against it. The owner of the third tractor trailer was later dismissed on a directed verdict. The jury returned a verdict for the plaintiff against the defendant. The trial court denied the defendant's motion for new trial and, with little explanation, also suggested a remittitur of the jury's verdict in all four categories of damages awarded. After the defendant appealed, the Court of Appeals affirmed the trial court's rulings regarding the pretrial agreement between the plaintiff and the owner of the third tractor trailer. Regarding the trial court's remittitur, the Court of Appeals reinstated the jury's award for lost earning capacity, suggested a further remittitur to the award for loss of enjoyment of life, and affirmed the remitted award in the remaining two categories of damages. On appeal, we affirm the trial court's rulings regarding the pretrial agreement. We find no error in the trial court's decision not to give the jury a special instruction on superseding cause. We hold that the Court of Appeals had no authority to suggest a further remittitur absent a finding that the jury's award—as remitted by the trial court—exceeds the uppermost boundary of the range of reasonableness under the evidence at trial, and so we reverse the Court of Appeals' remittitur of the award for loss of enjoyment of life. As to the trial court's remittitur, in view of the sharply conflicting evidence on the plaintiff's damages, the trial court's failure to indicate the reasons for its suggested remittitur leaves us unable to determine whether the evidence preponderates against the remittitur and, consequently, unable to conduct a proper appellate review of the trial court's remittitur decision. Accordingly, we remand the case to the trial court for explanation of its reasons for

suggesting remittitur of the jury's award. For the same reason, the Court of Appeals was without sufficient information to perform a meaningful review of the trial court's suggested remittitur, so we vacate the Court of Appeals' decision to reverse the trial court's remittitur of the award on lost earning capacity. The decision of the Court of Appeals is affirmed in part and reversed in part, and the case is remanded to the trial court for further proceedings.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Affirmed in Part, Reversed in Part, Vacated in Part, and Remanded**

HOLLY KIRBY, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, C.J., and CORNELIA A. CLARK, J., joined. SHARON G. LEE, J., filed an opinion concurring in part and dissenting in part.

Thomas A. Bickers, Ryan M. Conner, and Dwight E. Tarwater (on appeal), Knoxville, Tennessee, and Jim Summers and Kevin W. Washburn (at trial and on appeal), Memphis, Tennessee, for the appellant, Celadon Trucking Services, Inc.

Thomas R. Greer (at trial and on appeal) and R. Sadler Bailey (at trial), Memphis, Tennessee, for the appellee, Donriel A. Borne.

W. Bryan Smith, Memphis, Tennessee, John Vail, Washington, D.C., and Brian G. Brooks, Greenbrier, Arkansas, for the Amicus Curiae, Tennessee Association for Justice.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of a vehicular accident in Memphis, Tennessee, involving three tractor trailer vehicles. Thirty-year-old Plaintiff Donriel Borne worked as a truck driver for Trimac, a company that delivers air products. On July 1, 2009, Mr. Borne was driving a Trimac tanker, a tractor trailer vehicle, for his employer. When he encountered a traffic backup on the interstate, he slowed and then stopped. Immediately behind Mr. Borne, Harold Foster was driving a tractor trailer truck owned by Defendant Celadon Trucking Services, Inc. ("Celadon"). Mr. Foster was unable to stop his vehicle and rear-ended Mr. Borne's truck. The impact caused damage to Mr. Borne's vehicle and to the front of the Celadon vehicle.

A few seconds later, the Celadon vehicle was struck from behind by a tractor trailer driven by Steve Dondeville. Mr. Dondeville's vehicle was owned by Chickasaw Container Services, Inc. ("Chickasaw").

Immediately after the accident, Mr. Borne was shaken up but not in much pain. He finished driving his route and returned the Trimac tanker to Louisiana, where Trimac is based.

*Chronology of Treatment and Evaluations*

A few days after the accident, Mr. Borne began experiencing neck and back pain.[1] He first sought treatment from his family physician. During this time, Mr. Borne continued to work as a tractor trailer driver, including the tasks associated with pre-trip and maintenance inspections and loading cargo.

After about six months of treatment from his family physician, Mr. Borne found that he was still in pain. In December 2009, he stopped working as a truck driver and pursued a workers' compensation claim. In connection with the workers' compensation claim, Mr. Borne saw a physician provided by his employer, who placed him on light duty and sent him to physical therapy.

In the same period, Mr. Borne's attorney recommended that he see board certified neurosurgeon Donald Dietze, M.D. Dr. Dietze issued further work restrictions, which Trimac could not meet, so Mr. Borne ceased working altogether. In February 2010, Dr. Dietze ordered a magnetic resonance imaging (MRI) scan. The scan showed a central disc herniation at the L4-5 level. Dr. Dietze's subsequent treatment of Mr. Borne included facet and spinal injections, which provided short-term relief. Dr. Dietze concluded that Mr. Borne's pain was caused by the L4-5 central disc herniation, and so began assessing Mr. Borne as a possible surgical candidate.

On June 30, 2010, Mr. Borne filed the instant lawsuit against Celadon, Mr. Foster, Chickasaw, and Mr. Dondeville in the Circuit Court for Shelby County, Tennessee. Mr. Borne sought compensatory damages for personal injuries he sustained in the July 1, 2009 accident. The answer filed by Celadon and Mr. Foster denied liability, alleged comparative fault by Mr. Borne, Chickasaw, and Mr. Dondeville, and asserted the defenses of unavoidable accident and independent intervening cause. The remaining defendants filed an answer denying liability, and discovery ensued. After some discovery, the claims against Mr. Foster and Mr. Dondeville were voluntarily dismissed.

---

[1] As discussed further below, Mr. Borne was involved in an automobile accident that occurred about two weeks before the tractor trailer accident that is the subject of this lawsuit. Mr. Borne sustained a neck injury in that accident and took time off work.

3

During this time, the treatment and evaluation of Mr. Borne's condition continued. The workers' compensation carrier hired Najeeb Thomas, M.D., a board certified neurosurgeon, to evaluate Mr. Borne's condition. In September 2010, Dr. Thomas performed an independent medical examination ("IME") on Mr. Borne. At that time, Mr. Borne was complaining of low back pain, neck pain, and some numbness and tingling in his legs and toes. After reviewing Mr. Borne's February 2010 MRI, Dr. Thomas concluded that Mr. Borne was experiencing "simply . . . some low back strain." Dr. Thomas said that Mr. Borne's pain did not appear to be "discogenic" in nature, so he did not recommend surgical intervention or any further injections. Instead, he recommended physical therapy. Upon completion of the physical therapy, Dr. Thomas believed that Mr. Borne would "likely be at maximum medical improvement."

Meanwhile, to assess whether Mr. Borne would benefit from surgery, Dr. Dietze ordered a lumbar discogram. The discogram took place shortly after Dr. Thomas's IME. It showed the expected abnormalities at L4-5, but it did not indicate that those abnormalities were the "pain generator" for Mr. Borne. After Dr. Dietze received the results of the discogram, he took surgery "off the table" but concluded that Mr. Borne could benefit from a medical procedure called a rhizotomy, which is directed at the facet area of the spine, as well as an intradiscal electrothermal treatment directed at the disc. However, the workers' compensation carrier declined to authorize such treatments. After that, Dr. Dietze declared that Mr. Borne had reached maximum medical improvement and assessed Mr. Borne with a 10% impairment rating. Dr. Dietze ordered a functional capacity evaluation of Mr. Borne by a physical therapist.

In April 2011, Mr. Borne was involved in another motor vehicle accident. In this incident, Mr. Borne's vehicle rear-ended another vehicle. The collision shattered the other vehicle's rear windshield and dented both vehicles.

Several weeks after the April 2011 collision, Mr. Borne presented to Dr. Dietze again, this time complaining of an increase in low back pain and right knee pain. Mr. Borne told Dr. Dietze that his right knee pain had increased during the prior two weeks and that his low back pain had increased since his last office visit.

In late May and early June 2011, about two months after the April 2011 vehicular accident, physical therapist Courtney Roberts, DPT, performed the functional capacity evaluation on Mr. Borne ordered by Dr. Dietze. Dr. Roberts reviewed Mr. Borne's medical records, interviewed him at length, and then had Mr. Borne perform a series of exercises and tests to assess his abilities, restrictions and level of pain. After assessing Mr. Borne's ability to work, Dr. Roberts recommended further physical therapy for him and felt that he would benefit from it.

In July 2011, at the request of Mr. Borne's attorney, vocational analyst Anthony Gamboa, Ph.D., did an assessment of how Mr. Borne's physical limitations had affected

his capacity to work and earn money. To perform his assessment on Mr. Borne, Dr. Gamboa reviewed Dr. Dietze's medical records, Mr. Borne's work history, earning records and vocational evaluation, and Dr. Roberts' May/June 2011 functional capacity examination.

Thereafter, from October 2011 to April 2012, Mr. Borne participated in the extensive physical therapy Dr. Roberts recommended for him in her functional capacity evaluation. Mr. Borne responded well to the physical therapy. By April 2012, Mr. Borne's pain had diminished significantly, he was able to reduce his use of medication, and he improved his gait, his ability to walk distances, and his ability to engage in activities around the house. At the conclusion, Dr. Roberts released Mr. Borne to continue exercise and physical therapy on his own.

In January 2012, at the request of Celadon, vocational rehabilitative counselor Carla Seyler performed a vocational rehabilitation examination on Mr. Borne. Prior to meeting with Mr. Borne, Ms. Seyler obtained information about him regarding his education, work history, medical condition, and physical restrictions. She reviewed his medical records, did vocational testing, and reviewed the report and subsequent testimony of physical therapist Courtney Roberts. She then looked at jobs available in Mr. Borne's community and interviewed Mr. Borne to prepare an opinion as to whether Mr. Borne would be able to make the same income he was making at the time of the Celadon accident.

In early March 2012, Celadon asked board certified neurosurgeon Robert Applebaum, M.D., to examine Mr. Borne. Dr. Applebaum's letter to Celadon's attorney regarding the examination stated that Mr. Borne "may have sustained an injury to his neck and back in an accident over two and a half years ago. Examination at the current time does not show any significant mechanical or neurological findings." Dr. Applebaum offered to review any recent diagnostic studies on Mr. Borne.

That same month, March 2012, Dr. Dietze ordered a second MRI on Mr. Borne. Certified radiologist Lawrence Glorioso, M.D., interpreted the MRI. Among other things, Dr. Glorioso opined that Mr. Borne had suffered an annular fibrosis tear that was consistent with trauma. He did not think Mr. Borne's spinal condition resulted from chronic spine problems.

Dr. Applebaum also reviewed the March 2012 MRI; his interpretation differed from that of Dr. Glorioso. Dr. Applebaum noted that the MRI showed a moderate bulge at the L4-5 level, but he did not feel that it was clinically significant. He saw no indication of herniated disc or nerve root irritation. Dr. Applebaum also reviewed the December 2009 x-rays of Mr. Borne's lumbar spine. In Dr. Applebaum's opinion, the x-rays indicated that Mr. Borne had mild to moderate degenerative changes that would have predated the July 2009 accident.

In June of 2012, workers' compensation neurosurgeon Dr. Thomas performed another IME on Mr. Borne. In this updated IME, Dr. Thomas concluded that, though Mr. Borne had sustained a lumbar strain, his condition had improved. He opined that Mr. Borne could do light-duty work, and possibly medium duty work. Dr. Thomas did not think that Mr. Borne would benefit from either surgery or a rhizotomy. He recommended that Mr. Borne continue using the medications Flexeril and Lodine as needed and continue his program of home back-strengthening exercises.

In July 2012, at the request of Mr. Borne's attorney, behavioral health and rehabilitation counselor C. Greg Cates, Ed.D., performed a vocational evaluation on Mr. Borne. Dr. Cates reviewed Mr. Borne's medical records, psychological assessments, and functional assessments. He observed Mr. Borne and interviewed him. Dr. Cates assessed Mr. Borne's work loss under three scenarios, first crediting Dr. Dietze's initial assessment that Mr. Borne is not capable of performing sedentary work, then crediting the assessment that Mr. Borne can perform sedentary work, and finally crediting the assessment that Mr. Borne can perform light-duty work.

In early 2013, leading up to the scheduled trial, Mr. Borne continued to receive treatments from Dr. Dietze in an effort to provide temporary pain relief and improve functionality.


*Pretrial Agreement*

Meanwhile, the parties continued preparation for the trial, scheduled to begin on Monday, May 20, 2013.

On Friday, May 17, 2013, counsel for Mr. Borne advised Celadon's attorneys that Mr. Borne and Chickasaw had entered into a written agreement. Under the agreement, the parties agreed that Chickasaw was not at fault in the accident, that Chickasaw and Mr. Borne would cooperate in the proceedings, that Mr. Borne would take no action adverse to Chickasaw in the trial, and that Chickasaw would owe Mr. Borne only half of any judgment that might be entered against Chickasaw.

The trial began as scheduled. On the morning of the first day of trial, counsel for Celadon advised the trial court of the agreement between Chickasaw and Mr. Borne. Celadon characterized it as a Mary Carter agreement[2] and argued that it should be

---

[2] As discussed further below, some courts consider so-called Mary Carter agreements, named after the type of agreement found in *Booth v. Mary Carter Paint Co.*, 202 So. 2d 8 (Fla. Dist. Ct. App. 1967), *abrogated by Dosdourian v. Carsten*, 624 So. 2d 241 (Fla. Aug. 26, 1993), to be violative of public policy, though others either generally approve their use or permit them under certain circumstances. *See infra* note 6.

admitted into evidence and made available for impeachment purposes. Celadon expressed concern that an attorney for Chickasaw had indicated that he planned to use Chickasaw's peremptory challenges for the benefit of Mr. Borne and possibly to the detriment of Celadon.

There was no objection at that time to Celadon's request to use the written agreement at trial. In response to Celadon's request, the trial judge said "Okay" but otherwise made no ruling.

That same day, during the voir dire of potential jurors, counsel for Mr. Borne referenced the agreement with Chickasaw, and Celadon objected. The trial court allowed Mr. Borne's attorney to ask potential jurors about any opinion they might have of an agreement between Mr. Borne and Chickasaw, but it declined to permit him to discuss the content of the agreement.

The next day, Celadon filed a motion to admit the written agreement into evidence and use it at trial. After the jury was selected and sworn, Celadon announced, "[T]o preserve the record, at this time we're going to move to strike the panel based upon the use of the Mary Carter Agreement and the collusion between Dondeville and the plaintiff's counsel in striking the jurors[. T]hey worked together to strike them. And we're just putting that on the record." Both Chickasaw and Mr. Borne argued that the issue was waived. The trial judge again responded, "Okay," but did not otherwise rule on the motion.

Celadon then argued that the agreement should be admitted into evidence and made available for impeachment. Chickasaw objected to admitting the written agreement into evidence as an exhibit but agreed that Celadon would be permitted to read the agreement into evidence "word for word" during its case-in-chief and could ask witnesses about the agreement. The trial court reserved its ruling on whether the written agreement could be made an exhibit, but it noted that the parties had agreed that the agreement could be referenced and read into evidence.

During opening statements, counsel for Mr. Borne referred to the agreement with Chickasaw, and counsel for Celadon read a portion of it to the jury. The trial record indicates that, during the ensuing presentation of Celadon's proof, Celadon did not read the agreement into evidence, use the agreement to impeach any witnesses, or seek to introduce it as an exhibit. The agreement did not come up again until after the close of both parties' proof.

7

*Trial Testimony*

The trial lasted seven days. Mr. Borne testified on his own behalf and presented both lay and expert testimony to support his claim for damages.

At the outset of his testimony, Mr. Borne described how the July 1, 2009 accident occurred. Mr. Borne described the impact with the Celadon vehicle as a "hard" impact that caused the hood of his tractor trailer to pop open and damaged the front of the Celadon truck. At that time, he was not aware that the Chickasaw tractor trailer rear-ended the Celadon truck immediately after the Celadon truck struck Mr. Borne's vehicle.

Mr. Borne described the progression of his symptoms and his overall treatment. He outlined his decision to seek treatment from his family physician for low back pain while continuing to drive the tractor trailer, and his decision six months later to file a workers' compensation claim. After the workers' compensation physician restricted him to light-duty work and recommended that he see his own doctor, Mr. Borne said, his attorney referred him to neurosurgeon Dr. Dietze.

Mr. Borne described how his injuries had affected his ability to work, engage in hobbies, and do normal activities. He enjoyed driving a truck; he missed being a truck driver and being able to earn a living. Before the accident, he had enjoyed hunting and fishing. Since his injury, Mr. Borne said, he can fish only if his wife helps him get his boat in and out of the water, and when he goes hunting, he sits in a chair in the woods. He said that he does yard work and household chores if he is able, but sometimes he is not able. Mr. Borne has not worked since the Celadon accident and has instead drawn workers' compensation benefits. His inability to work has left him depressed and worried about how he will pay his living expenses.

Mr. Borne conceded that he was involved in an automobile accident on June 18, 2009, about two weeks before the accident with the Celadon vehicle. After this accident, he went to the hospital emergency room and was diagnosed with whiplash. As a result, he took approximately a week off from work. Mr. Borne maintained that any residual pain from the June 2009 accident had resolved by the time the July 1, 2009 accident occurred.

Mr. Borne also acknowledged he was involved in another accident on April 1, 2011, nearly two years after the Celadon accident. In that accident, Mr. Borne's vehicle "bumped" a van in front of him. It dented the other vehicle and "shattered" its rear windshield. He conceded that, when he disclosed the April 2011 accident to the physical therapist who evaluated him, Dr. Roberts, he indicated to her that it was just a fender-bender and that it caused no damage to either vehicle.

8

Mr. Borne agreed that the physical therapy with Dr. Roberts, completed in April 2012, had improved his functionality to the point that he could lift a twenty-five pound box. The improvement from the physical therapy allowed Mr. Borne to reduce his intake of anti-inflammatory medication and muscle relaxers to the point that he only took them when he overdid activities. He said that he does home exercises, walks on a treadmill, and he and his wife walk every other day. Despite this, Mr. Borne said it was his understanding that Dr. Dietze had not released him to do even sedentary work.

Mr. Borne's wife, Tamara Williams, corroborated his testimony. Before the accident, she said, Mr. Borne was a hard worker and a "handy" person who did yard work and things around the house, and he also helped his mother. After the accident, it upset Mr. Borne to no longer be able to work or to help her and his mother the way he did before the accident; Ms. Williams described Mr. Borne as depressed. She agreed that Mr. Borne's functionality improved when he did physical therapy with Dr. Roberts.

At trial, Mr. Borne's neurosurgeon Dr. Dietze testified to a reasonable degree of medical certainty that Mr. Borne had suffered a permanent musculoskeletal injury as a result of the July 1, 2009 accident. Dr. Dietze first detailed his course of treatment for Mr. Borne. In 2012, Dr. Dietze perceived that Mr. Borne's pain increased between 2011 and 2012, so he ordered an updated MRI and compared the MRI taken in 2010 with the one taken in 2012. He said that the comparison showed an accelerated degeneration of Mr. Borne's L4-5 disc beyond what would normally occur as part of the aging process. He felt that the most logical explanation for the accelerated degeneration was an injury to the L4-5 disc in the July 1, 2009 accident.

Dr. Dietze conceded that, in reaching this opinion, he did not recall being aware that Mr. Borne had been in an automobile accident two weeks before the July 1, 2009 accident with the Celadon vehicle. In addition, Dr. Dietze was not told of Mr. Borne's April 2011 traffic accident when Mr. Borne saw him in May 2011, complaining that he had had increased knee pain for about two weeks and increased low back pain as well. Dr. Dietze learned of the April 2011 accident at a later time. Dr. Dietze acknowledged that the 2011 accident, if significant enough, could have produced sufficient trauma to account for the accelerated degeneration of Mr. Borne's disc.

Dr. Dietze said he did diagnostic tests on Mr. Borne that indicated that his pain and functionality would benefit from a rhizotomy, a burning of certain nerve endings, and they were seeking approval for the procedure from the workers' compensation carrier. He noted that, at the time physical therapist Dr. Roberts performed the 2011 functional capacity evaluation he ordered, Mr. Borne was not capable of performing sedentary work. After Mr. Borne completed the physical therapy Dr. Roberts recommended, his functionality improved. However, Dr. Dietze did not order an updated functional capacity evaluation. Dr. Dietze was asked what kind of work Mr. Borne would be able to

9

do if the recommended rhizotomy were successful; Dr. Dietze noted that the physical therapy with Dr. Roberts went very well and that the therapist had documented improved strength and functionality. He then said, "I do think he could at least meet the sedentary, and I would say light—possible light duty, somewhere in that range."

Radiologist Dr. Glorioso testified about his interpretation of the MRI performed on Mr. Borne in March 2012. After viewing the MRI, Dr. Glorioso opined that Mr. Borne had suffered an annular fibrosis tear, a disc herniation at the L4-5 level, bulging discs at the L2-3 and L3-4 levels, and signs of facet arthrosis, which is consistent with a degenerative spinal problem. Dr. Glorioso said that the annular fibrosis tear could be a pain generating source, and the herniation at L4-5 was consistent with trauma and was likely a pain generating source.

Physical therapist Dr. Roberts testified as well. She outlined her procedure for performing the functional capacity evaluation in late May and early June 2011. At that time, she concluded that Mr. Borne was "not quite capable of performing sedentary work activities," the lowest level of work activities, involving sitting for most of the time with occasional periods of walking or standing. At the conclusion of the functional capacity evaluation, Dr. Roberts recommended further physical therapy for Mr. Borne.

Dr. Roberts testified that, from October 2011 to April 2012, Mr. Borne underwent the extensive physical therapy she had recommended for him. Dr. Roberts said that the physical therapy resulted in significant improvement in Mr. Borne's functionality. By April 2012, Mr. Borne reported that his pain levels had improved, down at times to only a 2 on a scale of 10. He was able to fish, cook, carry a cooler filled with shrimp, lift twenty-five pounds, and walk and stand for over two hours at a strawberry festival. He took medication for his pain mainly on the weekends when he overdid activity. Mr. Borne increased his activities around the house, improved his gait, and enhanced his ability to walk long distances. At the conclusion, Dr. Roberts released Mr. Borne to continue exercise and physical therapy on his own.

Dr. Roberts was not asked to update her June 2011 functional capacity evaluation after Mr. Borne completed the recommended round of physical therapy. However, at the time of trial, based on her observations of Mr. Borne during physical therapy, it was Dr. Roberts' opinion that Mr. Borne had improved to the point that he could probably perform sedentary work.

Behavioral health and rehabilitation counselor Dr. Cates testified at trial about his vocational evaluation on Mr. Borne. After reviewing Mr. Borne's medical records, psychological assessments, and functional assessments, Dr. Cates observed Mr. Borne and interviewed him at length about his age, education, and work history. Crediting Dr. Dietze's initial assessment that Mr. Borne is not capable of performing sedentary work, Dr. Cates said, then he is unemployable and his work loss would be 100%. In the

alternative, even crediting the assessments indicating that Mr. Borne can perform sedentary or light work, Dr. Cates felt that employers were not likely to respond well to the length of time Mr. Borne had been off work. Consequently, if it is assumed that Mr. Borne can perform sedentary work, Dr. Cates felt that his loss of vocational opportunity would be 95-98% of jobs with directly transferrable skills. Assuming Mr. Borne could perform light-duty work, Dr. Cates calculated his loss of vocational opportunity at approximately 93% for jobs with directly transferrable skills, 58% loss for jobs with generally transferrable skills, and 45% loss for unskilled jobs. Put differently, Dr. Cates opined that, if Mr. Borne were deemed capable of performing sedentary or light-duty work, he would be available for 55% of unskilled jobs.

Vocational analyst Anthony Gamboa testified at trial about his economic assessment of how Mr. Borne's physical limitations had affected his capacity to work and earn money. Dr. Gamboa's vocational economic assessment was based on Dr. Dietze's medical records, Mr. Borne's work history, earning records and vocational evaluation, and Dr. Roberts' June 2011 functional capacity evaluation. Based on this information, Dr. Gamboa concluded that Mr. Borne could neither sit nor stand for extended periods of time, so he could only do the type of sedentary work that would allow him to alternate sitting and standing. Given these restrictions and Mr. Borne's low level of reading comprehension, Dr. Gamboa opined that he would be able to perform only about 2% of the jobs in the labor market. He felt that employers would be reluctant to hire someone like Mr. Borne who had been out of work for several years. Given these parameters, Dr. Gamboa described Mr. Borne as essentially "unemployable." Based on the average Louisiana heavy truck driver's earnings in 2011 dollars, and projecting Mr. Borne continuing to work until age sixty, Dr. Gamboa calculated Mr. Borne's lost earning capacity at $1,334,647.

Dr. Gamboa acknowledged that his calculation of Mr. Borne's lost earning capacity was done without knowledge of the improvement in his functionality after completing several months of physical therapy with Dr. Roberts. If it is assumed that Mr. Borne can perform light-duty or sedentary work, Dr. Gamboa said, then the vocational economic assessment "would be done in a very, very different way," and his loss of earning capacity would be less. However, Dr. Gamboa pointed out that Mr. Borne had only performed physical jobs in the past, such as working as a welder or a truck driver, so his lack of experience in light-to-sedentary jobs would put him at a competitive disadvantage in applying for those jobs. This testimony concluded Mr. Borne's case-in-chief.

Celadon then presented evidence in response. It first presented testimony from the passenger in Mr. Borne's vehicle, Talmadge Mevers. Generally, Mr. Mevers' testimony about how the accident with the Celadon vehicle occurred corroborated Mr. Borne's version of the events. Mr. Mevers described the impact from the Celadon vehicle as a "pretty good little pound."

Harold Foster, the driver of the Celadon tractor trailer vehicle, gave a similar account of how the accident occurred. However, Mr. Foster said that he "didn't hardly feel anything" when his vehicle rear-ended Mr. Borne's vehicle. Mr. Foster testified that the subsequent impact from the Chickasaw vehicle rear-ending the Celadon vehicle was so light that he did not feel it.

Celadon offered testimony from Douglas Morr, a biomechanical engineer who performed a forensic accident reconstruction of the July 2009 accident. Mr. Morr examined the photographs and repair records on the damage to the vehicles, reviewed the police reports and deposition testimony on how the accident occurred, researched information about the type of vehicles involved such as their weight and dimensions, and viewed the accident location. Focusing on the impact, he compared this information with Mr. Borne's medical records, his height and weight, and the witnesses' descriptions of Mr. Borne's injuries. Mr. Morr concluded that the force and acceleration of the July 2009 accident were not consistent with the cervical or lumbar injuries that Mr. Borne claimed that he sustained in the July 2009 accident.

Celadon also presented the opinion testimony of Dr. Thomas, the neurosurgeon who examined Mr. Borne at the request of his workers' compensation carrier. Dr. Thomas reviewed an MRI performed in February 2010 and concluded that Mr. Borne had low back strain. Dr. Thomas examined Mr. Borne again in 2012, after Mr. Borne had completed the physical therapy with Dr. Roberts. Dr. Thomas determined that Mr. Borne's condition had improved significantly since his first visit and that he had reached maximum functional improvement. He felt that Mr. Borne's condition was lumbar strain or that it could be arthritic in nature. Dr. Thomas was of the opinion that, while Mr. Borne could not do heavy-duty work, he could do light-duty work or perhaps even work that was light-to-medium-duty.

Celadon also offered the testimony of neurosurgeon Robert Applebaum. Dr. Applebaum examined Mr. Borne after his physical therapy with Dr. Roberts, and he reviewed his medical records, including the MRI films read by Dr. Glorioso and relied upon by Dr. Dietze. Dr. Applebaum concluded that Mr. Borne likely had no disease or damage involving his spinal cord or nerve roots and that there were no significant neck or back mechanical or neurological findings. He found degenerative changes in the lumbar spine that would have predated an accident in July 2009. Dr. Applebaum noted a moderate disc bulge at the L4-5 level but felt that it was not clinically significant. Dr. Applebaum found no evidence of impairment and concluded to a reasonable degree of medical certainty that Mr. Borne could return to work in any occupation for which he was otherwise qualified.

Rehabilitation counselor Carla Seyler also testified on behalf of Celadon. Ms. Seyler performed her vocational rehabilitation examination on Mr. Borne after he had completed physical therapy with Dr. Roberts. She interviewed Mr. Borne, reviewed his

12

work and educational history, and did vocational testing. She reviewed Mr. Borne's medical records, including those of Dr. Dietze and Dr. Applebaum, as well as the records of physical therapist Dr. Roberts. She interpreted the records of Dr. Dietze[3] and Dr. Roberts as indicating that Mr. Borne would be able to perform sedentary to light-duty work, and she interpreted Dr. Applebaum's records as indicating that Mr. Borne could return to his regular work with no restrictions. Under either physical evaluation, Ms. Seyler opined, Mr. Borne would be able to secure a job compatible with his education, work history, and physical restrictions, and he would be able to replace his income prior to the July 2009 accident. To overcome the three-year gap in his work history, Ms. Seyler suggested that Mr. Borne spend a period of time working short-term jobs for a temporary service, to gradually get back into the workforce. After a period of transition, Ms. Seyler asserted, Mr. Borne would be able to secure a job making an amount of money that would equal or exceed what he was making at the time of the accident.

*Jury Instructions*

After the close of proof, Celadon asked the trial judge to give the jury an instruction about the pretrial agreement between Mr. Borne and Chickasaw. Mr. Borne objected that there was no evidentiary basis for an instruction because the agreement was never admitted into evidence. Celadon responded that the trial court had never ruled on Celadon's request to admit the agreement into evidence. The trial court questioned whether the agreement was relevant in light of the fact that Chickasaw had been dismissed from the case. The trial court asked the attorneys, "If we do let the Mary Carter Agreement go back to the jury, then do we want 2.26[4] in?" It then denied Celadon's request for an instruction on the agreement and added, "[W]e'll cut 2.26 out."

Celadon also requested a special jury instruction on superseding cause. Initially, Mr. Borne consented to the instruction. Subsequently, however, Mr. Borne objected to a superseding cause instruction, contending that there was no proof that any accident other than the July 1, 2009 accident was the likely cause of Mr. Borne's injury. The trial court denied Celadon's request for a superseding cause instruction.

---

[3] Ms. Seyler interpreted Dr. Dietze's opinion as stating that Mr. Borne would be able to perform light-duty work once he had the rhizotomy that Dr. Dietze recommended.

[4] Tennessee Pattern Jury Instruction—Civil 2.26 provides:

> You may consider evidence that a witness who was also involved in this incident [collision] has compromised and settled the witness' claim only for the purpose of deciding whether or not that witness has any interest or bias in this case. You may not consider any settlement as an admission of liability for any loss or damage.

8 Tenn. Prac. Pattern Jury Instr. T.P.I. —Civil 2.26 (2013 ed.).

After deliberations, the jury returned a verdict in favor of Mr. Borne. The jury awarded him $1,455,000 for loss of earning capacity, $750,000 for physical pain and mental suffering, $750,000 for permanent injury, and $750,000 for loss of enjoyment of life, for a total verdict of $3,705,000.

Celadon filed a motion for a new trial or, in the alternative, for a remittitur of the jury's award. The trial court denied the motion for a new trial.

However, the trial court granted Celadon's request for remittitur of the jury's verdict. The trial court's order noted that it did not find that the jury acted with "passion, prejudice or caprice," but it deemed the award "excessive." The trial court suggested a remittitur in these categories: loss of earning capacity reduced from $1,455,000 to $1,100,000; pain and suffering reduced from $750,000 to $500,000; permanent injury reduced from $750,000 to $100,000; and loss of enjoyment of life reduced from $750,000 to $400,000. Thus, the trial court suggested a total remittitur of $1,605,000, reducing the total award from $3,705,000 to $2,100,000. In lieu of a new trial, Mr. Borne accepted the reduced award under protest. *See* Tenn. Code Ann. § 20-10-102(a) (2009). Celadon appealed.

In the Court of Appeals, Celadon asserted that the agreement between Mr. Borne and Chickasaw violates public policy. As such, Celadon argued, the trial court erred in declining to strike the jury panel, admit the agreement into evidence, and give the jury instruction on the agreement requested by Celadon. Celadon also contended that the trial court erred in declining to instruct the jury on superseding cause. Celadon maintained that the trial court's remittitur of the jury verdict was insufficient and asked the appellate court to suggest a further remittitur. *Borne v. Celadon Trucking Servs., Inc.*, No. W2013-01949-COA-R3-CV, 2014 WL 3778743, at *2 (Tenn. Ct. App. July 31, 2014), *perm. app. granted* (Tenn. Dec. 18, 2014).

In response, Mr. Borne argued that Celadon had waived any objections to the agreement with Chickasaw. He also contended that the trial court erred by suggesting any remittitur of the jury's verdict. *Id.* at *2-3.

On appeal, the Court of Appeals rendered a divided opinion. As to Celadon's arguments on the agreement with Chickasaw, it noted that Celadon had not contended at trial that the agreement violated public policy; Celadon only raised the argument in its motion for new trial. Under those circumstances, the Court of Appeals held, Celadon waived any argument on the validity of the agreement. *Id.* at *5. The intermediate court found that the trial court did not abuse its discretion in permitting limited discussion of the agreement during jury selection and declined to grant Celadon relief on the trial

14

court's failure to strike the jury panel. *Id.* at \*8. The Court of Appeals found no error in the trial court's decision not to grant Celadon's request to admit the agreement into evidence, since the request came after the close of proof and there had been no reference to the agreement during the proof phase of the trial. *Id.* at \*10. It held that Celadon had waived any objection to the trial court's denial of its request for a jury instruction on the agreement by failing to raise the issue in its motion for new trial. *Id.* The Court of Appeals also upheld the trial court's denial of a superseding cause instruction. It concluded that Celadon's theory simply presented a question of cause-in-fact, so the jury instructions given on proximate cause and legal cause were sufficient. *Id.* at \*17.

As to damages, the majority affirmed the awards for permanent injury and for pain and suffering as reduced by the trial court. It reversed the trial court's suggested remittitur of the award for loss of earning capacity and reinstated the jury award of $1,455,000. As to the award for loss of enjoyment of life, the majority suggested its own further remittitur, reducing that award from $400,000 as remitted by the trial court down to $50,000. Thus, the majority of the Court of Appeals approved a total award to Mr. Borne of $2,105,000. *Id*. at \*33.

Judge Steven Stafford filed a separate opinion, dissenting in part from the majority opinion. Judge Stafford concurred with the majority's rulings with respect to the procedural issues, and he also agreed with its reversal of the trial court's remittitur of the jury award for loss of earning capacity. However, as discussed more fully below, Judge Stafford disagreed with the procedure followed by the majority in suggesting its own further remittitur of the jury's award for loss of enjoyment of life. *Id*. at \*34 (Stafford, J., dissenting in part).

We granted both parties' applications for permission to appeal.

## ANALYSIS

### Pretrial Agreement

On appeal to this Court, Celadon's assertions regarding the agreement between Mr. Borne and Chickasaw form the centerpiece of its arguments.

Celadon contends first that the agreement violates Tennessee public policy, so the trial court erred by failing to invalidate the agreement and vacate the jury verdict. Celadon argues that the agreement had the effect of misleading the jury, amounting to a violation of Celadon's right to a jury trial under article I, section 6 of the Tennessee Constitution. It asserts that the agreement disregarded the link between fault and liability, thus circumventing Tennessee's comparative fault system and subverting the administration of justice. Celadon maintains that the agreement compromises the integrity of the legal profession and the justice system, manipulates the trial process, and

15

furthers the perception that lawyers are duplicitous and the justice system is untrustworthy. For these reasons, Celadon argues that we should grant a new trial.

As noted by the Court of Appeals, in its motion for new trial, Celadon characterized Mr. Borne's agreement with Chickasaw as a "Mary Carter" agreement and generally questioned its validity.[5] However, during the trial itself, Celadon did not argue that the agreement was invalid or against public policy. At trial, Celadon argued only that the agreement should be admitted into evidence so that the jury would know about it and Celadon could use it to impeach witnesses.

Raising the issue in the motion for new trial is necessary but not sufficient. "It is well settled in this state that a party cannot raise a new issue . . . on motion for a new trial[] that was not within the scope of the pleadings and was not presented to the court at the trial of the case." *Serv-U-Mart, Inc. v. Sullivan Cnty.*, 527 S.W.2d 121, 124 (Tenn. 1975). Grounds raised in a motion for new trial must have been raised at trial. *See Moss v. Sankey*, 54 S.W.3d 296, 299 & n.3 (Tenn. Ct. App. 2001) (declining to grant relief of claim of error first raised in a motion for new trial); *see also Norris v. Nationwide Mut. Fire Ins. Co.*, 728 S.W.2d 335, 338 (Tenn. Ct. App. 1986); *Allen v. Melton*, 99 S.W.2d 219, 228 (Tenn. Ct. App. 1936). Because Celadon failed to challenge the validity of the agreement either prior to trial or during the trial, we deem this issue waived.

Celadon argues next that the trial court erred in declining to admit the agreement into evidence. Prior to trial, Celadon filed a motion to admit the written agreement into evidence and use it at trial. After the jury was selected and sworn, Celadon argued that the agreement should be admitted into evidence and made available for impeachment.

---

[5] As acknowledged by Celadon, the agreement between Mr. Borne and Chickasaw bears some similarities to a so-called "Mary Carter" agreement," but it is also dissimilar in some ways:

> ["Mary Carter" agreement refers to an agreement where] one or more, but fewer than all, tort defendants will agree with the tort plaintiff to pay the plaintiff a specified maximum sum of money (often the limits of any policy of insurance), with the amount to be reduced or eliminated by any collectible judgment the plaintiff obtains against the remaining, non-agreeing defendant. In addition, the agreement will permit or require the agreeing defendants to continue to participate in the lawsuit (which of course they have an incentive to do, since it is in their financial interest that the plaintiff obtain as large a judgment against the non-agreeing defendant as possible), and will often provide that, since the parties have already agreed to the maximum recovery against the agreeing defendants, the plaintiff will not execute on any judgment obtained against them.

7 Samuel Williston, *Williston on the Law of Contracts* § 15:2 (Richard A. Lord ed., July 2015). Secrecy is not essential to a "Mary Carter" agreement, but the agreement works more to the advantage of the parties to it if it remains secret. This aspect of the typical agreement has caused some courts to hold them invalid; other courts have permitted them if they are disclosed to the court, to the non-agreeing defendant, and ultimately to the jury. *Id*.

The trial court reserved its ruling on the motion but noted that the parties had agreed that the agreement could be referenced and read into evidence. The agreement was referenced during opening statements, and counsel for Celadon read a portion of it to the jury.

During the ensuing trial, Celadon did not attempt to use the agreement to impeach witnesses, as it had requested in its pretrial motion. It did not offer the agreement as an exhibit during its case-in-chief. After the close of proof, Celadon asked the trial court to admit the agreement into evidence. At that point, the trial court noted that Chickasaw had been dismissed from the case and would not be on the jury form, and it questioned whether the agreement was even relevant. The trial court did not clearly rule on Celadon's motion, but the agreement was not admitted into evidence.

"Generally, the admissibility of evidence is within the sound discretion of the trial court." *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 131 (Tenn. 2004) (citing *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992)). "The trial court's decision to admit or exclude evidence will be overturned on appeal only where there is an abuse of discretion." *Id.* "A trial court abuses its discretion only when it 'applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'" *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)). "The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court." *Id.* (citing *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998)).

Here, as noted by the trial court, neither party referred to Mr. Borne's agreement with Chickasaw during the proof phase of the trial, and Chickasaw was dismissed from the case at the close of Mr. Borne's proof. Admitting the agreement into evidence after the close of proof might have foreclosed Mr. Borne from rebutting any suggestion of bias arising out of the agreement, absent a decision to reopen the proof. Under these circumstances, we see no abuse of the trial court's discretion in failing to admit the agreement into evidence.

Celadon next contends that the agreement resulted in Mr. Borne and Chickasaw colluding on use of their peremptory challenges.[6] It argues that this amounted to a

---

[6] At trial, after the jury was selected and sworn, Celadon moved to strike the panel "based upon the use of the Mary Carter Agreement and the collusion between Dondeville and the plaintiff's counsel in striking the jurors[. T]hey worked together to strike them." Chickasaw and Mr. Borne both argued that the issue was waived. The trial judge again responded, "Okay," but did not otherwise rule on the motion. No party asked for clarification of the trial court's ruling.

17

violation of Tennessee Code Annotated section 22-3-104, which provides for the division of peremptory challenges among parties.[7]

The record does not support Celadon's argument that the agreement resulted in the misuse of peremptory challenges. Under Tennessee Code Annotated section 22-3-104 and Tennessee Rule of Civil Procedure 47.03,[8] Mr. Borne had six peremptory challenges, Celadon had four peremptory challenges, and Chickasaw had four peremptory challenges. The record shows that twelve jurors were excused without cause, but it does not identify which party excused any particular juror or even indicate how many challenges each party exercised. Although Celadon contends that Mr. Borne and Chickasaw collaborated in their use of peremptory challenges, we find no support in the record for this assertion. On the first day of trial, before voir dire, Celadon's lawyer made an oral motion in which he claimed that Chickasaw's lawyer had said that he planned to use peremptory challenges for the benefit of Mr. Borne. The record does not

---

[7] Tennessee Code Annotated section 22-3-104 provides in relevant part:

(a) Either party to a civil action may challenge four (4) jurors without assigning any cause.

(b) In the event there is more than one (1) party plaintiff or more than one (1) party defendant in a civil action, four (4) additional challenges shall be allowed to such side or sides of the case; and the trial court shall, in its discretion, divide the aggregate number of challenges between the parties on the same side, which shall not exceed eight (8) challenges to the side, regardless of the number of parties. Even when two (2) or more cases are consolidated for trial purposes, the total challenges shall be eight (8), as provided in this subsection (b).

Tenn. Code Ann. § 22-3-104(a)-(b) (2009).

[8] Tennessee Rule of Civil Procedure 47.03 provides:

After prospective jurors have been passed for cause, counsel will submit simultaneously and in writing, to the trial judge, the name of any juror in the group of the first twelve (or more if additional jurors are seated) who has been seated that either counsel elects to challenge peremptorily. Upon each submission, each counsel shall submit either a challenge or a blank sheet of paper. Neither party shall make known the fact that the party has not challenged. Replacement jurors will be seated in the panel of twelve (or more) in the order of their selection. If necessary, additional replacement jurors will then be examined for cause and, after passed, counsel will again submit simultaneously, and in writing, to the trial judge, the name of any juror in the group of twelve (or more) that counsel elects to challenge peremptorily. This procedure will be followed until a full jury has been selected and accepted by counsel. The trial judge will keep a list of those challenged and, if the same juror is challenged by both parties, each will be charged with the challenge. The trial judge shall not disclose to any juror the identity of the party challenging the juror.

Tenn. R. Civ. P. 47.03.

indicate whether this in fact occurred or to what extent. After the jury was empaneled, Celadon's lawyer noted his objection to the jury panel "to preserve the record" but made no offer of proof. On appeal, Celadon likewise points to no proof in the record for its assertion.

By failing to show an evidentiary basis for its argument, Celadon has waived this issue. *See* Tenn. R. App. P. 27(a)(A)(7) (requiring briefed arguments to include "appropriate references to the record"); *Reid v. Reid*, 388 S.W.3d 292, 295 (Tenn. Ct. App. 2012) (noting that the parties, not the courts, carry the burden to ensure "'that the record on appeal contains a fair, accurate, and complete account of what transpired with respect to the issues being raised'" (quoting *Trusty v. Robinson*, No. M2000-01590-COA-R3-CV, 2001 WL 96043, at *1 (Tenn. Ct. App. Feb. 6, 2001) (citing Tenn. R. App. P. 24(b))); *cf. State v. Thompson*, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000) (holding that the appellate court could not consider defendant's claim that the trial court improperly declined to remove a particular prospective juror for cause because, although the record showed that some party used a peremptory challenge to remove the particular juror, the record did not show which party used its peremptory challenge to remove the particular juror or whether the defendant used all of his peremptory challenges).

Finally, Celadon argues that the trial court erred by declining to charge the jury regarding the agreement between Mr. Borne and Chickasaw. However, the record does not include the jury instruction Celadon requested. Moreover, although Celadon's motion for new trial asserted that the trial court erred by failing to strike the jury because of the agreement, it does not include an argument based on the trial court's failure to grant its request for a jury instruction on the agreement.

On appeal, we view a motion for new trial in the light most likely to permit us to consider a given question. *Waters v. Coker*, 229 S.W.3d 682, 689 (Tenn. 2007). Nevertheless, the party raising an issue in a motion for new trial must state the issue "with reasonable certainty so as to enable appellate courts to ascertain whether the issue was first presented for correction in the trial court; otherwise, the matter cannot be considered on appeal." *Id.* (citing *State v. Gauldin*, 737 S.W.2d 795, 798 (Tenn. Crim. App. 1987)). Specifically, appellate review based on an alleged error in jury instructions is waived unless the party asserting error details this claim of error in its motion for new trial. Tenn. R. App. P. 3(e). We must hold that Celadon waived this issue by failing to identify it with reasonable certainty in its motion for new trial.

### Superseding Cause

Celadon next argues that the trial court committed reversible error in rejecting its request for a special jury instruction on superseding cause.[9] Celadon first argues that the

---

[9] Celadon asked the trial court to instruct the jury according to Tennessee Pattern Jury Instruction—Civil 3.24, which states:

trial court erroneously determined that a preponderance of the evidence did not support the instruction because it should have applied a "material evidence" standard to the issue. Second, Celadon argues that substantial evidence supported a finding that the April 2011 accident was the superseding cause of Mr. Borne's injuries and that Celadon heavily relied on this theory of defense. For these reasons, Celadon claims, the trial court erred in declining to give the requested superseding cause instruction, and Celadon was prejudiced by the trial court's failure to do so.

In response, Mr. Borne asserts that, when read as a whole, the trial court's instructions on causation-in-fact and legal cause were sufficient to appropriately instruct the jury on the issue of causation. He maintains that Celadon's theory of defense during the trial was that Mr. Borne was not injured at all, in the July 2009 accident or otherwise, and that he was capable of earning the income he made before the accident. In the alternative, Celadon claimed that Mr. Borne's back condition resulted from a pre-existing degenerative back condition and was unrelated to any trauma. Therefore, Mr. Borne contends, a superseding cause instruction was not warranted. Even if the trial court's failure to give the instruction constitutes error, Mr. Borne asserts, the error was harmless because Celadon offered no medical evidence that Mr. Borne sustained any additional harm in the April 2011 accident.

Whether a jury has been properly instructed presents a question of law that we review de novo with no presumption of correctness. *Troup v. Fischer Steel Corp.*, 236 S.W.3d 143, 149 (Tenn. 2007).

> Trial courts have a duty to give substantially accurate instructions with regard to every fact and theory raised by the pleadings and supported by the proof. These instructions should be couched in plain terms easily understood by lay persons.

---

A cause of injury is not a legal cause when there is a superseding cause. For a cause to be a superseding cause, all of the following elements must be present:

1. The harmful effects of the superseding cause must have occurred after the original negligence;

2. The superseding cause must not have been brought about by the original negligence;

3. The superseding cause must actively work to bring about a result which would not have followed from the original negligence; and

4. The superseding cause must not have been reasonably foreseeable by the original negligent party.

*Borne*, 2014 WL 3778743, at *11 n.14 (quoting Tennessee Pattern Jury Instruction—Civil 3.24).

Instructions should not contain inaccurate or inapplicable statements of legal principles that might tend to confuse the jury. However, instructions are not expected to be perfect. Our task on appeal is to review the instructions in their entirety, and to examine the challenged instruction in context to determine whether the instructions, as a whole, fairly and accurately embody the parties' theories.

Appellate courts review the entire charge just like a jury would, rather than through the practiced eye of a judge or lawyer. We will not invalidate instructions as long as they fairly define the legal issues in the case and do not mislead the jury. An erroneous instruction will not necessarily be considered reversible error if the trial court later explains or corrects the instruction or if the trial court adequately explains the issues in the case in other portions of its charge.

Trial courts should carefully consider requested instructions because the requesting parties are entitled to them (1) if they are supported by the evidence, (2) if they embody a theory relied on by the party, (3) if they are correct statements of the law, and (4) if their substance is not already contained in other portions of the charge. However, trial courts may decline to give a requested instruction (1) if it is not supported by the evidence, (2) if its substance is already covered in the charge, or (3) if it is incorrect or incomplete in any respect.

*Ingram v. Earthman*, 993 S.W.2d 611, 635-36 (Tenn. Ct. App. 1998) (citations omitted). Here, it is undisputed that the jury instruction requested by Celadon is a correct statement of the law on superseding cause. Thus, the parties' arguments center on whether the evidence and arguments at trial supported a superseding cause instruction and, if so, whether the substance of such an instruction was adequately covered elsewhere in the charge that was given.

We consider first whether the requested instruction is supported by the evidence and the arguments. *Id*. at 637. We agree with the Court of Appeals below that the proper standard is the "material evidence" standard; a trial court may instruct the jury on an issue of fact within the scope of the pleadings when there is evidence in the record that is "sufficient to sustain a verdict" on the issue, i.e., material evidence.[10] *White v. Premier Med. Grp.*, 254 S.W.3d 411, 416 (Tenn. Ct. App. 2007) (*Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d 822, 823 (Tenn. 1994)); *see also Johnson v. Tenn. Farmers Mut. Ins. Co.*, 205 S.W.3d 365, 372 (Tenn. 2006) (citing *Street v. Calvert*, 541 S.W.2d 576, 584

---

[10] Given that the "material evidence" standard applies when determining whether the evidence was sufficient to support a jury instruction, we agree with the Court of Appeals that, "[i]nsofar as the trial court relied upon the preponderance of the evidence standard in determining whether to instruct the jury on superseding cause, such reliance was in error." *Borne*, 2014 WL 3778743, at *11.

(Tenn. 1976); *Spellmeyer v. Tenn. Farmers Mut. Ins. Co.*, 879 S.W.2d 843, 846 (Tenn. Ct. App. 1993)). To determine whether the record contains material evidence to support a verdict, the appellate court must review the record and "take the strongest legitimate view of all the evidence in favor of the verdict, assume the truth of all evidence that supports the verdict, allow all reasonable inferences to sustain the verdict, and discard all countervailing evidence." *Akers v. Prime Succession of Tenn., Inc.*, 387 S.W.3d 495, 501 (Tenn. 2012) (quoting *Barkes v. River Park Hosp., Inc.*, 328 S.W.3d 829, 833 (Tenn. 2010)).

We examine whether there is material evidence in the record sufficient to sustain the jury verdict Celadon sought, namely, a finding by the jury that a superseding cause brought about a result that would not have followed from Celadon's original negligence. The most recent Restatement of Torts describes intervening or superseding cause as a subset of proximate cause: "When a force of nature or an independent act is also a factual cause of harm, an actor's liability is limited to those harms that result from the risks that made the actor's conduct tortious." Restatement (Third) of Torts: Phys. & Emot. Harm § 34 (2010 & June 2017 update). The comments to this Restatement provision indicate that it reflects "the evolution in the jurisprudence of causation, as well as the impact of comparative responsibility on . . . liability determinations."[11] *Id.* at comment (a).

"The essential elements of the defense of superseding cause are as follows: (1) the harmful effects of the superseding cause must have occurred after the original negligence;

---

[11] For comparison, see the definition of superseding cause in the Second Restatement of Torts:

> A superseding cause is an act of a third person or other force which by its intervention *prevents* the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about.

Restatement (Second) of Torts, § 440 (1965) (emphasis added), *quoted in Godbee*, 213 S.W.3d at 884. The comments to the Restatement (Third) of Torts note that, at the time that the Restatement (Second) of Torts was drafted, comparative liability principles were not considered in determining liability:

> [A]t the time of the Second Restatement, contributory negligence, contribution based on pro rata shares, and joint and several liability were the law. A negligent tortfeasor held jointly and severally liable for harm that also was caused by an intentional tortfeasor could, at best, obtain contribution from the intentional tortfeasor for the intentional tortfeasor's pro rata share. No mechanism existed for adjusting the liability of the negligent and intentional tortfeasor according to their comparative culpability.
> . . . .
> [T]he advent of comparative principles has reduced the role for superseding cause.

Restatement (Third) of Torts: Phys. & Emot. Harm § 34, cmt (c). Thus, as the superseding cause doctrine has evolved under comparative principles, a superseding cause may merely limit the original tortfeasor's liability; it need not cut it off entirely. Restatement (Third) of Torts: Phys. & Emot. Harm § 34.

(2) the superseding cause must not have been brought about by the original negligence; (3) the superseding cause must actively work to bring about a result which would not have followed from the original negligence; and (4) the superseding cause must not have been reasonably foreseen by the original negligent party."[12]  *White*, 254 S.W.3d at 417 (citing *Godbee*, 213 S.W.3d at 882).

The record in this case contains material evidence to support a defense of superseding cause.  It is undisputed that, in April 2011, almost two years after the July 2009 collision with the Celadon vehicle, Mr. Borne was involved in an accident in which his vehicle rear-ended another vehicle.  Although Mr. Borne minimized the seriousness of the April 2011 accident, according to his own description, the collision "shattered" the other vehicle's rear windshield and dented both vehicles.  A few weeks after the April 2011 accident, Mr. Borne presented to Dr. Dietze complaining of a recent increase in low back pain and right knee pain.  In that visit, Dr. Dietze was not told that Mr. Borne had recently been involved in another vehicular accident.  Dr. Dietze acknowledged in his testimony that the 2011 accident, if significant enough, could have produced sufficient trauma to account for the accelerated degeneration of Mr. Borne's disc.  Biomedical engineer Douglas Morr testified on behalf of Celadon that, based on his forensic reconstruction of the July 2009 accident and the information in the record on Mr. Borne's injuries, the force and acceleration of the July 2009 accident were not consistent with the cervical or lumbar injuries that Mr. Borne claimed he sustained in the July 2009 accident.

Taking the strongest legitimate view of this evidence, allowing all reasonable inferences from it and disregarding countervailing evidence, the record contains evidence sufficient to support a finding that Mr. Borne's April 2011 accident caused harmful effects that occurred after his July 2009 accident with the Celadon vehicle, that the April 2011 collision was not brought about by the July 2009 accident, that the April 2011 accident caused Mr. Borne's condition to worsen beyond what would have followed from the July 2009 accident alone, and that the April 2011 accident could not have been reasonably foreseen by Celadon.  Thus, there is material evidence in the record pertaining to each element of the defense of superseding cause; therefore, the record would have

---

[12] The dissent takes issue with our reference to the Third Restatement's definition of superseding cause.  Describing superseding cause as a subset of proximate cause, however, is not a departure from Tennessee law, which now recognizes comparative responsibility in liability determinations.  *See Godbee*, 213 S.W.3d at 883-88 (engaging in a thorough discussion about the relationship between proximate cause, superseding cause, and comparative fault).  The dissent itself points out that "[s]uperseding cause is included within the proximate causation analysis."  As noted above, the Third Restatement's definition is also consistent with our adoption of comparative liability principles.  Moreover, we continue to use the four-factor approach in determining whether the doctrine of superseding cause applies.  *See White*, 254 S.W.3d at 417 (citing *Godbee*, 213 S.W.3d at 882).

supported a decision by the trial court to give the proposed jury instruction on superseding cause.[13]

This conclusion, however, does not end our inquiry. Trial courts need not grant a request for a jury instruction if the general jury charge already covers the substance of the requested instruction. *Johnson*, 205 S.W.3d at 372 (citing *Otis* 850 S.W.2d at 445). A trial court will be reversed for an erroneous omission of a jury instruction only where the error prejudices the rights of the requesting party. *Id.* (citing *Spellmeyer*, 879 S.W.2d at 846). "This court has repeatedly found erroneous or omitted instructions to be harmless when we have concluded that the error did not or could not have played a material role in the jury's decision-making process." *Grandstaff v. Hawks*, 36 S.W.3d 482, 497 n.28 (Tenn. Ct. App. 2000).

To prevail on a negligence claim, a plaintiff must prove the following: "1) a duty of care owed by the defendant to the plaintiff; 2) conduct falling below the applicable standard of care amounting to a breach of that duty; 3) an injury or loss; 4) causation-in-fact; and 5) proximate, or legal, cause." *King v. Anderson Cnty.*, 419 S.W.3d 232, 246 (Tenn. 2013) (citing *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009)); *see also Parker v. Holiday Hospitality Franchising, Inc.*, 446 S.W.3d 341, 350 n.7 (Tenn. 2014) (quoting *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 355 (Tenn. 2008)). The first two elements (duty and breach of that duty) are not in dispute in this case. At issue are the remaining three elements, namely, the extent of the injuries suffered by Mr. Borne, causation-in-fact, and the proximate (legal) cause of any such injuries.

At trial, Celadon mounted a multi-pronged defense. In addition to arguing the effects of the April 2011 accident, the record included evidence indicating that Mr. Borne's injuries may have resulted from the accident that occurred on June 18, 2009, about two weeks before the accident with the Celadon vehicle; Mr. Borne was hospitalized after the June 2009 accident and had just returned to work when the Celadon collision occurred. Moreover, Celadon emphasized that Mr. Borne was able to continue working as a trucker for several months immediately following the July 2009 accident. Celadon put on testimony from neurosurgeon Dr. Applebaum, who said that his examination of Mr. Borne showed only degenerative changes in the lumbar spine that would have predated the July 2009 accident. Dr. Applebaum found no evidence that Mr. Borne suffered any impairment at all, and he asserted that Mr. Borne could return to work in any occupation for which he was otherwise qualified. Celadon put on testimony from workers' compensation neurosurgeon Dr. Thomas, who believed that Mr. Borne's condition was merely lumbar strain or that it could be arthritic in nature. Celadon also

---

[13] Because we have found material evidence in the record to support a superseding cause instruction based on the April 2011 accident, we need not address Celadon's assertion that Mr. Borne's continued work after the July 2009 Celadon accident was also a superseding cause.

24

offered the testimony of rehabilitation counselor Carla Seyler, who asserted that, after a period of transition, Mr. Borne would be able to secure a job earning wages equal to or exceeding the wages he was making at the time of the accident.

Thus, Celadon's overall theory of defense included an argument that the April 2011 accident was a superseding cause but was hardly limited to that argument. Celadon's defense used several approaches to attack the plaintiff's proof on both causation-in-fact and proximate cause.

The trial court gave the jury complete instructions on the issues of causation-in-fact and proximate, or legal, cause.[14] These instructions tracked the Tennessee Pattern Jury Instructions prepared for cases of this sort and set forth an accurate statement of the law on causation. This instruction enabled the jury to consider whether the April 2011 accident, or some other event or condition, caused Mr. Borne's injuries.

"[W]hen a party takes issue with a trial court's refusal to give a requested instruction, our task is to review the instructions actually given in their entirety, and to determine whether they fairly and accurately embody the parties' theories." *Braswell v. Lowe's Home Centers, Inc.*, 173 S.W.3d 41, 42-43 (Tenn. Ct. App. 2005) (citations

---

[14] The trial judge's oral instructions on causation-in-fact and proximate cause were as follows:

A negligence claim requires proof of two types of causation, [cause-in-fact] and legal cause. [Cause-in-fact] and legal cause are distinct elements of the negligence claim and both must be proven by the plaintiffs by a preponderance of the evidence. [Cause-in-fact]: The defendant's negligent conduct is a [cause-in-fact] of the plaintiff's injury if, as a factual matter, it directly contributed to the plaintiff's injury and without it, plaintiff's injury would not have occurred. It is not necessary the defendant's action is the sole cause of plaintiff's injury, only that it be a cause.

Once you have determined that a defendant's negligence is a [cause-in-fact] of the plaintiff's injury, you must decide whether the defendant's negligence was also a legal cause of the plaintiff's injury. The law in Tennessee sets out two requirements to determine whether an act or omission was a legal cause of the injury or damage.

One, the conduct must have been a substantial factor in bringing about the harm being complained of and, two, the harm giving rise to the action could have been recently foreseen or anticipated by a person of ordinary intelligence and care.

To be a legal cause of an injury, there is no requirement that the cause be the only cause, the last act or the one nearest to the injury so long as a substantial factor in producing the injury or damage. The foreseeability requirement does not require the person guilty of negligence to foresee the exact manner in which the injury takes place or the exact person who would be injured. It is enough that the person guilty of negligence could foresee or through the use of reasonable care should have foreseen the general [matter] in which the injury or damage occurred.

25

omitted). "We have a duty to uphold a jury's verdict whenever possible." *Grandstaff*, 36 S.W.3d at 497. Viewing the record as a whole, we conclude that the instructions the trial court used fairly embodied the parties' claims and defenses and provided the jury with the appropriate legal principles needed to decide the case. Accordingly, we cannot hold that the trial court erred in declining to give the special jury instruction on superseding cause.[15]

[15] Although the dissent agrees with the majority that the trial court did not err in declining to give a jury instruction on superseding cause, it bases its conclusion on a different view of Celadon's arguments and the evidence in the record. The dissent recognizes that Celadon presented an "all of the above" defense; in addition to contesting causation in fact, it argued that Mr. Borne's April 2011 accident caused harmful effects that would not have followed from his July 2009 collision with Celadon's vehicle. The dissent contends, however, that "the facts relied on by Celadon *only* supported an argument regarding cause in fact, not superseding cause." Respectfully, this is incorrect.

As outlined above, there was ample evidence in the record that the April 2011 accident was more serious than Mr. Borne would admit and that Mr. Borne presented to Dr. Dietze a few weeks after the April 2011 accident complaining that he had been experiencing increased pain for about two weeks. Dr. Dietze conceded that the 2011 accident could have produced sufficient trauma to account for the accelerated degeneration of Mr. Borne's disc, and Celadon presented expert testimony that the injuries Mr. Borne claimed could not have resulted from the 2009 collision alone. Under the material evidence standard, there was material evidence in the record to support a factual finding that Mr. Borne's 2011 accident caused harmful effects that occurred after his 2009 collision with the Celadon vehicle, and that the April 2011 accident constituted a superseding cause. Thus, substantial evidence in the record would have supported a superseding cause instruction.

The dissent cites two cases as "helpful to [the] analysis" that are, in fact, too far afield to support the dissent's position. The dissent first cites *Godbee*, 213 S.W.3d at 865, in which the appellant argued that the trial court erred in *giving* a superseding cause instruction rather than failing to give one, the *converse* of the situation presented in this case. It also cites *Pellicano v. Metropolitan Government of Nashville & Davidson County*, No. M2003-00292-COA-R3-CV, 2004 WL 343951 (Tenn. Ct. App. Feb. 23, 2004), an appeal from a bench trial that did not discuss jury instructions at all. *Id.* at *2. Importantly, both cases involved the defendant's argument that a *pre-existing* condition actually caused the plaintiff's injuries, rather than a later-occurring cause. *Godbee*, 213 S.W.3d at 883 (claiming that the plaintiff's pre-existing degenerative condition rather that the defendant's medical negligence caused the plaintiff's injuries); *Pellicano*, 2004 WL 343951, at *3-5 (claiming that a pre-existing herniated disc necessitated the plaintiff's surgery rather than the defendant's negligence). The dissent briefly acknowledges that these cases are factually distinguishable, but it fails to recognize the critical nature of the distinguishing fact in both cases—that a pre-existing condition cannot logically constitute a superseding cause. *See Godbee*, 213 S.W.3d at 884 ("The doctrine of superseding cause is . . . applied where . . . the injury was actually brought about by a *later* cause of independent origin that was not foreseeable.") (quoting 1 T. Schoenbaum, *Admiralty and Maritime Law* § 5-3, pp. 165-166 (2d ed.1994) (emphasis added)); *see also id.* at 887 ("If the intervening force is in operation at the time the defendant acted, it is not an intervening cause at all.") (citing Dan B. Dobbs, *The Law of Torts*, § 186, at 461 (2000)); *see also Davis v. McGuigan*, 325 S.W.3d 149, 160 (Tenn. 2010) ("To establish that an intervening event is a superseding cause, [a plaintiff] must show . . . that the harmful effects of the intervening event occurred after his allegedly reckless conduct . . . ."). Therefore, neither *Godbee* nor *Pellicano* support the dissent's analysis.

One other note. In the course of the dissent's analysis on superseding cause, it cites Tennessee cases for the propositions that "[i]ssues regarding causation in fact should be resolved before proximate

## Remittitur

The jury awarded Mr. Borne a total of $3,705,000 in compensatory damages: $1,455,000 for loss of earning capacity, $750,000 for physical pain and mental suffering, $750,000 for permanent injury, and $750,000 for loss of enjoyment of life.[16] In his denial of Celadon's motion for a new trial, the trial judge described the jury's award as "excessive" and suggested a remittitur down to the following amounts: $1,100,000 for loss of earning capacity, $500,000 for physical pain and mental suffering, $100,000 for permanent injury, and $400,000 for loss of enjoyment of life, for a total remitted award of $2,100,000 in compensatory damages.

On appeal, the Court of Appeals reversed the trial judge's remittitur of the award for loss of earning capacity and reinstated the jury's award of $1,455,000. The Court of Appeals affirmed the trial court's remittitur of the remaining elements of damages with the exception of the award for loss of enjoyment of life. As to that award, the Court of Appeals found that the trial court's suggested remittitur was warranted by the evidence

---

cause issues are considered" and "a superseding cause instruction assumes that the defendant's negligence is the cause in fact of the plaintiff's injuries." It is important to place these points in proper context. Tennessee cases have pointed out that, in structuring the order of analysis, the trier of fact considers intervening and superseding cause only after causation in fact has been established. *Waste Mgmt., Inc. of Tenn. v. S. Cent. Bell Tel. Co.*, 15 S.W.3d 425, 432 (Tenn. Ct. App. 1997) (citing *Doe v. Linder Constr. Co.*, 845 S.W.2d 173, 184 (Tenn.1992)). However, "proximate cause and intervening cause remain jury questions in the comparative fault decision-making process." *Id.* (citing *Haynes v. Hamilton Cnty.*, 883 S.W.2d 606, 612 (Tenn. 1994)). Thus, "the trier of fact will decide all causation-in-fact issues before determining whether a defendant who might otherwise be liable should be relieved from liability because of the independent and unforeseen conduct of another." *Id.* at 433 (emphasis added).

These cases describe the order of analysis—causation-in-fact before superseding cause—but they do not preclude any party from disputing both causation-in-fact and superseding cause. Had the superseding cause instruction been given, the jury would have first decided whether Mr. Borne's July 2009 collision with the Celadon vehicle was a cause-in-fact of his injury, and then it would have determined whether the April 2011 accident constituted an intervening or superseding cause. *See* 8 Tenn. Prac. Pattern Jury Instr. TPI—Civil 3.22 (2016 ed.) ("Once you have determined that the defendant's negligence is a [cause-in-fact] of the plaintiff's injury, you must decide whether the defendant's negligence was also a legal cause of the plaintiff's injury."); *Waste Mgmt., Inc. of Tenn.*, 15 S.W.3d at 432 ("Intervening cause appears to relate more to legal causation than to causation in fact because it does not come into play until after causation in fact has been established."). The order of analysis, i.e., that the trier of fact decides causation in fact before addressing superseding cause, has no bearing on whether the trial court in this case erred in declining to give a jury instruction on superseding cause.

[16] Mr. Borne's action accrued before the October 1, 2011 effective date of the Tennessee Civil Justice Act of 2011, which limits the amount of non-economic damages that can be awarded. Tennessee Civil Justice Act of 2011, ch. 510, §§ 10, 24, 2011 Tenn. Pub. Acts ch. 510 (codified at Tenn. Code Ann. §§ 29-39-101 to -104 (2012 & Supp. 2016)).

and then went on to suggest its own further remittitur. Its suggested remittitur reduced the award for loss of enjoyment of life down to $50,000. Thus, the Court of Appeals' remitted damage award totaled $2,105,000. *Borne*, 2014 WL 3778743, at *24, *33.

Mr. Borne asks this Court to reinstate the jury's verdict. If we do not, he asks us to reverse the Court of Appeals' further remittitur of the award for loss of enjoyment of life. He also asks us to modify the trial court's standard of review such that a trial court may suggest a remittitur only upon an express finding that the verdict is unreasonable and therefore excessive. Celadon asserts that Mr. Borne's arguments are contrary to case precedent, statutory law, and the rules of appellate procedure. It contends that the trial court and Court of Appeals erred by failing to sufficiently remit the awards for pain and suffering and permanent injury and that the Court of Appeals erred by reinstating the jury's loss of earning capacity award. Additionally, the Amicus Curiae, Tennessee Association for Justice, asks this Court to require trial judges to explain their reasons for suggesting a remittitur and argues that a trial court may only suggest a remittitur if the jury's award is outside the range of reasonableness.

We consider first the Court of Appeals' further remittitur of the award for loss of enjoyment of life, and then we consider the trial court's suggested remittitur.

*Court of Appeals' Further Remittitur*

As set forth above, after the jury awarded Mr. Borne damages for loss of enjoyment of life in the amount of $750,000, the trial court suggested a remittitur reducing the award to $400,000. The Court of Appeals below suggested a further remittitur of the award for loss of enjoyment of life, reducing it drastically from the amount as remitted by the trial court:

> After reviewing the record in this case, and cases we have deemed similar, we find that even with the trial court's suggested remittitur, the award for loss of enjoyment of life remains excessive and is against the preponderance of the evidence. Accordingly, we exercise our statutory prerogative to reduce the award to $50,000.00.

*Borne*, 2014 WL 3778743, at *33.

The above quote from the Court of Appeals refers to the appellate court's ability to suggest a further remittitur as a "statutory prerogative," apparently relying on Tennessee Code Annotated section 20-10-103(a). *Borne*, 2014 WL 3778743, at *19, *33. This statute provides the procedure for a plaintiff to accept a remittitur under protest and appeal the remittitur decision, whether the remittitur is suggested by the trial court or by the Court of Appeals:

> If the judgment of the trial court with regard to a remittitur is affirmed in the court of appeals, so that a party is required to make a remittitur or suffer a new trial, as in the judgment of the trial court, or if, by the opinion of the court of appeals, a further or a larger remittitur is required of the party in whose favor the verdict was rendered, or if after the case was tried in the lower court by the trial judge without a jury, or if after the case was tried in the lower court with a jury and no remittitur was suggested by the trial judge, a remittitur is first suggested or required in the court of appeals, on penalty of granting a new trial, then in each and all of these events the party in whose favor the verdict or judgment has been rendered may make the remittitur under protest in the court of appeals, and take the case, by application for permission to appeal, for review upon that point, to the supreme court.

Tenn. Code Ann. § 20-10-103(a) (2009). The language used by the Court of Appeals may imply that this statute grants the Court of Appeals the authority to suggest a remittitur. It does not. Section 20-10-103(a) recognizes the Court of Appeals' authority to suggest a remittitur but does not confer such authority. *See Holt v. Compton Sales Co.*, 900 S.W.2d 291, 292 (Tenn. Ct. App. 1995) ("Although not specifically statutorily authorized, [section] 20-10-103(a) implicitly recognizes the authority of an appellate court to grant a further remittitur when the award, even as remitted by the Trial Court, is deemed excessive." (footnote omitted)). Indeed, the statute does not even refer to the Supreme Court's authority to suggest a remittitur, although obviously this Court has such authority, because the intent of the statute is simply to set forth the procedure for appealing a suggestion of remittitur.[17] We go on, then, to discuss the appropriate standard for the appellate court to suggest its own further remittitur.

In *Meals ex rel. Meals v. Ford Motor Company*, this Court emphasized that "[t]he Court of Appeals' authority to suggest a remittitur when the trial court has affirmed the verdict is far more circumscribed than that of the trial court." *Meals*, 417 S.W.3d 414, 423 (Tenn. 2013); *Coffey v. Fayette Tubular Prods.*, 929 S.W.2d 326, 331 (Tenn. 1996) ("Appellate courts also have the authority to suggest a remittitur although this authority is naturally more circumscribed than that possessed by the trial courts."). The *Meals* Court

---

[17] The statutes do not provide a mechanism for appealing an additur by the Court of Appeals. *See* Tenn. Code Ann §§ 20-10-101 through -103. Some Tennessee courts have inferred from this omission that the appellate courts do not have authority to suggest an additur, even if the amount of the jury's verdict falls below the range of reasonableness. *See, e.g.*, *Wilkerson v. Altizer*, 845 S.W.2d 744, 749 (Tenn. Ct. App. 1992) ("This Court does not have the authority to grant an additur.") (citing Tenn. Code Ann. § 20-10-101); *Moyer v. Herman*, No. 87-119-II, 1987 WL 15472, at *4 (Tenn. Ct. App. Aug. 12, 1987) (same); *see also* Donald F. Paine, *Remittitur and Additur*, 42 Tenn. B.J., Oct. 2006, at 25 ("[T]here can be no appellate additur").

explained that the standard for the appellate court to suggest its own remittitur is the "material evidence" standard:

> Where the trial judge has approved the verdict in its role as thirteenth juror[,] . . . the Court of Appeals' review of the verdict and its ability to suggest a remittitur is limited to a review of the record to determine whether the verdict is supported by material evidence. Material evidence is evidence material to the question in controversy, which must necessarily enter into the consideration of the controversy and by itself, or in connection with the other evidence, be determinative of the case. An appellate court is required to take the strongest legitimate view of all the evidence in favor of the verdict, assume the truth of all evidence that supports the verdict, allowing all reasonable inferences to sustain the verdict, and to discard all countervailing evidence. The material evidence analysis is very deferential to the award by the jury and the judgment of the trial court when it affirms the verdict as the thirteenth juror. *Ellis* [*v. White Freightliner Corp.*], 603 S.W.2d [125,] 129 [(Tenn. 1980)] ("[W]hen the trial judge has approved the verdict, the review in the Court of Appeals is subject to the rule that if there is *any* material evidence to support the award, it should not be disturbed.") (emphasis added)). "It matters not a whit where the weight or preponderance of the evidence lies under a material evidence review." *Hohenberg Bros. Co. v. Mo. Pac. R.R. Co.*, 586 S.W.2d 117, 119-20 (Tenn. Ct. App. 1979). "It is simply a search of the record to ascertain if material evidence is present to support the verdict." *Id*.

*Meals*, 417 S.W.3d at 422-23 (some citations and internal quotation marks omitted). Under the material evidence standard, this Court has explained, "the appellate court must affirm if there is any material evidence to support the verdict." *Coffey*, 929 S.W.2d at 331 n.2. The Court in *Coffey* emphasized: "This deferential standard is consonant with the principle, long recognized in Tennessee law, that the jury bears primary responsibility for awarding damages in a personal injury case, followed closely by the trial court in its role as thirteenth juror." *Id*.[18]

---

[18] Tennessee caselaw emphasizes that appellate courts should be especially reluctant to suggest a remittitur in the first instance where the jury award at issue is for non-economic damages, as for pain and suffering and loss of enjoyment of life:

> [T]he determination on such non-pecuniary losses as pain and suffering damages involves a subjective element not present in the determination of ordinary facts. The jury trial guarantee requires that the subjective element involved be that of the community and not of judges. . . . When appellate courts are called upon to review a jury's award of non-economic damages, it is not their prerogative to determine whether the award strikes them as too high or too low.

In *Meals*, the trial court approved the jury's verdict without suggesting a remittitur. *Meals*, 417 S.W.3d at 422-23. In this case, as noted by Judge Stafford in his dissent in the Court of Appeals below, the question of whether the *Meals* standard applies in a case in which the trial court has suggested a remittitur is an issue of first impression.[19]

We see no reason why the *Meals* material evidence standard would not remain applicable where the trial court has suggested a remittitur because, in such a case, the trial judge has in fact approved the jury's verdict up to the remitted amount.[20] *See Ellis*, 603 S.W.2d at 129 ("The trial judge's approval of a jury verdict invokes the material evidence rule with respect to all other issues of fact[,] and we know of no reason why that rule should not have the same effect when that approval includes the amount of the award. That action by the trial judge means that he has accredited the testimony of the witnesses on the issue of damages and has evaluated the evidence as supporting the amount awarded.").

Thus, regardless of whether the trial court suggested a remittitur of the jury's verdict, the standard for the appellate court to suggest remittitur of a jury's verdict is extraordinarily high. The appellate court may suggest remittitur only if it finds that the award exceeds the uppermost boundary of the range of reasonableness under the evidence presented, i.e., "'the amount beyond which there is no evidence, upon any reasonable

*Smartt v. NHC Healthcare/McMinnville, LLC*, No. M2007-02026-COA-R3-CV, 2009 WL 482475, at *21 (Tenn. Ct. App. Feb. 24, 2009) (citations and internal quotation marks omitted).

[19] In his dissent, Judge Stafford disagreed with the procedure used by the majority in suggesting its own remittitur based in part on the majority's failure to address the standard for the appellate court to suggest a further remittitur beyond the trial court's remittitur of the jury verdict: "While the majority Opinion acknowledges the *Meals* 'material evidence standard,' it does not discuss whether the *Meals* standard should apply in this case. . . . The issue of whether the *Meals* standard applies to this situation is an issue of first impression in this Court. . . . [T]o decide this issue without resolving whether the *Meals* standard is applicable is in error." *Id*. at *36 (Stafford, J., dissenting) (citations and footnote omitted). Judge Stafford's dissent correctly states: "The majority Opinion described the 'material evidence' standard as a 'lesser' standard. In contrast, I would describe [the] *Meals* material evidence standard as a much higher burden on the appellate court." *Borne*, 2014 WL 3778743, at *36 n.1 (Stafford, J., dissenting).

[20] In cases in which the appellate court finds that the trial court did not in fact approve the verdict up to the remitted amount, as where the trial court's remarks indicate disapproval of the verdict or the suggested remittitur destroys the verdict, it is incumbent upon the appellate court to grant a new trial. *Cooper v. Tabb*, 347 S.W.3d 207, 221 (Tenn. Ct. App. 2010) ("If it appears from any reasons assigned or statements made in passing on a motion for a new trial that the trial judge was not actually satisfied with the verdict, it is the duty of the appellate courts to grant a new trial, the material evidence rule notwithstanding." (citation and internal quotation marks omitted)). In such a case, then, the appellate court would not be in a position to suggest its own remittitur.

view of the case, to support the verdict.'"[21]  *Ellis*, 603 S.W.2d at 126 (quoting *Pitts v. Exxon Corp.*, 596 S.W.2d 830, 834 (Tenn. 1980)).  Where the trial court has suggested a remittitur, the Court of Appeals (or, for that matter, this Court) cannot grant its *own* further remittitur *unless* the award, even as remitted by the trial court, is more than the upper limit of the range of reasonableness, i.e., not supported by material evidence.  In other words, if the amount as remitted by the trial court is supported by material evidence, the appellate court has no authority to grant a *further* remittitur.[22]

---

[21] An appellate court utilizing remittitur should remit the award to the uppermost boundary of the range of reasonableness, i.e., the highest figure that could be supported by the material evidence in the record.  In doing so, the appellate judge is not fixing the amount he would award if he were the finder of fact but remitting the award to the highest amount any jury could properly award under the evidence presented at trial.

[22] The dissent contains a lengthy discussion of the standards for appellate review of a jury verdict and includes generalized criticism that the majority "rejects the appellate standard of review that has worked well."  However, as discussed in more detail below, the majority and the dissent agree as to the standards for appellate review in almost all circumstances.  When boiled down to its essence, the dissent appears to disagree with the majority on only *one* remittitur standard:  the standard for an appellate court to suggest *its own* further remittitur in a case in which the trial court has already suggested a remittitur.

As we have discussed, we hold that an appellate court's suggestion of *its own* further remittitur, in a case in which the trial court has already suggested a remittitur, is governed by the "material evidence" standard outlined in *Meals v. Ford*.  The dissent advocates a standard under which the appellate court may suggest its own further remittitur if, in the view of the appellate court, "the evidence preponderates in favor of a further reduction in the award of damages as remitted by the trial court."  Under the standard advocated by the dissent, appellate judges would have the *same* discretion to suggest a remittitur as do trial judges, even though appellate judges neither see nor hear the witnesses' testimony.  The dissent takes the position that the standard it advocates was adopted by this Court in *Coffey v. Fayette Tubular Products*, 929 S.W.2d 326 (Tenn. 1996).  Respectfully, this is incorrect.

In *Coffey*, the jury awarded $1,500,000 in punitive damages, the trial court remitted those damages to $500,000, and the Court of Appeals further remitted the punitive damages to $150,000.  *Coffey*, 929 S.W.2d at 327-28.  On appeal, this Court applied the well-established "preponderance of the evidence" standard in Section 20-10-102(b) to affirm the *trial court's* remittitur.  *Id.* at 331 ("After reviewing the record, we cannot say that a preponderance of the evidence is contrary to the trial court's findings.").

The *Coffey* Court's only statement on the standard for the appellate court to suggest its own further remittitur pointed out that appellate judges have *less* discretion than do trial judges:  "It is now well-settled that trial judges may suggest adjustments when the jury verdict is within the range of reasonableness of the credible proof . . . .  Appellate courts also have the authority to suggest a remittitur *although this authority is naturally more circumscribed than that possessed by the trial courts*."  *Id.* at 330-31 (emphasis added).  The Court in *Coffey* did not elaborate further on what the "more circumscribed" standard is for an appellate court to suggest a remittitur.  It affirmed the trial court's remittitur and reversed the Court of Appeals' further remittitur, *id.* at 331, which would necessarily be the result under *any* standard, once the Court determined that the award as remitted by the trial court was supported by a preponderance of the evidence.

In this case, in the Court of Appeals below, the language used by the majority indicates that it granted its own further remittitur of the award for loss of enjoyment of life to $50,000 based on its assessment of the preponderance of the evidence. *Borne*, 2014 WL 3778743, at *33 ("[W]e find that even with the trial court's suggested remittitur, the award for loss of enjoyment of life remains excessive and is against the preponderance of the evidence. Accordingly, we exercise our statutory prerogative to reduce the award to $50,000.00."). This was error. As discussed *infra* and noted by this Court in *Meals*, "'[i]t matters not a whit where the weight or preponderance of the evidence lies under a material evidence review.'" *Meals*, 417 S.W.3d at 423 (quoting *Hohenberg Bros.*, 586 S.W.2d at 119-20). Under the *Meals* standard, absent a finding that the award as remitted by the trial court was not supported by material evidence, the Court of Appeals had *no authority* to grant its own further remittitur. In this case, the Court of Appeals made no finding that the $400,000 award for loss of enjoyment of life as remitted by the trial court was more than the upper limit of the range of reasonableness under the evidence presented. Therefore, the Court of Appeals had no authority to further reduce Mr. Borne's award for loss of enjoyment of life to $50,000. Accordingly, we reverse the Court of Appeals' separate further remittitur.

*Trial Court's Remittitur*

Where a party invokes the right to a jury trial, our constitution requires "that the jury be allowed to determine all disputed issues of fact." *Spence v. Allstate Ins. Co.*, 883 S.W.2d 586, 594 (Tenn. 1994); *see also Meals*, 417 S.W.3d at 419 (citing Tenn. Const. art. I, § 6). The questions of disputed fact to be resolved by the jury include the type and amount of any damages awarded to the plaintiff. *Meals*, 417 S.W.3d at 419-20.

However, "a verdict of a jury is subject to the supervision of the trial court." *Foster v. Amcon Int'l, Inc.*, 621 S.W.2d 142, 144 (Tenn. 1981). "No verdict is valid until it is approved by the trial court judge." *Davidson v. Lindsey*, 104 S.W.3d 483, 488 (Tenn. 2003) (citing *Cumberland Tel. & Tel. Co. v. Smithwick*, 79 S.W. 803, 805 (Tenn. 1904)). In determining whether to approve the jury's verdict, the trial judge acts as a "thirteenth juror":

> "The reasons given for the rule are, in substance, that the circuit judge hears the testimony, just as the jury does, sees the witnesses, and observes their demeanor upon the witness stand; that, by his training and experience in the

Thus, *Coffey* did not reach the issue of the precise standard for an appellate court to suggest its own further remittitur, except to state affirmatively that appellate judges have less authority to suggest a remittitur than do trial judges. *Coffey* does not support the dissent's position.

weighing of testimony, and the application of legal rules thereto, he is especially qualified for the correction of any errors into which the jury by inexperience may have fallen, whereby they have failed, in their verdict, to reach the justice and right of the case, under the testimony and the charge of the court; that, in our system, this is one of the functions the circuit judge possesses and should exercise—as it were, that of a thirteenth juror. So it is said that he must be satisfied, as well as the jury; that it is his duty to weigh the evidence; and, if he is dissatisfied with the verdict of the jury, he should set it aside."

*Davidson*, 104 S.W.3d at 488 (quoting *Smithwick*, 79 S.W. at 804). "The purpose of the thirteenth juror rule is to be a 'safeguard . . . against a miscarriage of justice by the jury.'" *State v. Moats*, 906 S.W.2d 431, 434 (Tenn. 1995) (quoting *State v. Johnson*, 692 S.W.2d 412, 415 (Tenn. 1985) (Drowota, J., dissenting)).

The trial judge must be independently satisfied with the verdict; if the trial judge is dissatisfied with the verdict, the verdict must be set aside. *Holden v. Rannick*, 682 S.W.2d 903, 905 (Tenn. 1984). In addressing a motion for a new trial, the trial court has such broad discretion that it is not bound to give reasons for its action in granting or denying a new trial based on the preponderance of the evidence. *James E. Strates Shows, Inc. v. Jakobik*, 554 S.W.2d 613, 615 (Tenn. 1977). Indeed, when a trial judge approves the verdict without comment, the appellate court will presume that the trial judge has adequately performed his function as the thirteenth juror. *Holden*, 682 S.W.2d at 905 (citing *Cent. Truckaway Sys. v. Waltner*, 253 S.W.2d 985, 991 (Tenn. Ct. App. 1952)).

"However, when the trial judge's dissatisfaction is only with the amount of the jury award, and not with the allocation of liability or fault, he or she may suggest an additur or remittitur." *Bonner v. Deyo*, No. W2014-00763-COA-R3-CV, 2014 WL 6873058, at *4 (Tenn. Ct. App. Dec. 5, 2014) (citing *Turner v. Jordan*, 957 S.W.2d 815, 824 (Tenn. 1997)). Suggesting an additur or a remittitur in lieu of granting a new trial "avoids the necessity of conducting a new trial with its added expense and delay." *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 718 (Tenn. Ct. App. 1999). To avoid contravention of the right to jury trial clauses of the federal and state constitutions, the trial court must obtain the consent of the party against whom the additur or remittitur is to be entered; if that party does not consent, the trial court must order a new trial. *Spence*, 883 S.W.2d at 594; *see also* Tenn. Code Ann. §§ 20-10-101, -102. It has long been recognized that "[t]he amount of the verdict is primarily for the jury to determine, and next to the jury the most competent person to pass upon the matter is the judge who presided at the trial and heard the evidence." *Reeves v. Catignani*, 7 S.W.2d 38, 39 (Tenn. 1928).

"The power of a trial judge to disturb a verdict because of his dissatisfaction with the amount of damages rests in this state on more than a century of precedent and

practice." *Foster*, 621 S.W.2d at 144. However, over time, the contours of the trial court's prerogative to suggest a remittitur or additur have evolved.

In *Branch v. Bass*, 37 Tenn. 366 (1858), this Court ruled that the trial judge's suggested reduction in the amount of a jury's verdict did not improperly invade the province of the jury, noting "the delay and expense of another trial is saved to the parties." *Id*. at 370-71. At the turn of the century, the Court held that a trial judge could suggest a remittitur when the verdict is "so excessive as to indicate passion, prejudice, corruption, or caprice on the part of the jury." *W. Union Tel. Co. v. Frith*, 58 S.W. 118, 119 (Tenn. 1900). In *Alabama Great Southern Railroad Company v. Roberts*, 82 S.W. 314 (Tenn. 1904), the Court explained that suggesting a remittitur avoided the costly delay of prolonged litigation that would result from a new trial. *Id*. at 315.

In 1911, the General Assembly enacted the first remittitur statute. Act of Mar. 30, 1911, ch. 29, §§ 1-3, 1911 Tenn. Pub. Acts 62-63. This statute provided that a trial judge could suggest a remittitur after a verdict has been rendered upon a motion for new trial "whenever the Trial Judge is of the opinion that the verdict in favor of a party is so excessive as to indicate passion, prejudice, corruption, partiality, or unaccountable caprice on the part of the jury." *Id.* A few years later, however, in *Grant v. Louisville & Nashville R.R. Co.*, 165 S.W. 963 (Tenn. 1914), the Court explained that trial judges can suggest a remittitur to a jury verdict where the verdict is excessive regardless of whether there is an appearance of passion, prejudice, or caprice in a jury's verdict. *Id*. at 965. The Court explained: "There is no intimation in our earlier decisions that this power can be exercised only when passion, prejudice, or caprice appears in the verdict of the jury, nor is the right to suggest a remittitur restricted to such cases in other jurisdictions." *Id.*

In 1949, the remittitur statute was amended to provide that a trial judge could suggest a remittitur upon a motion for new trial when the judge is of the opinion that the verdict in favor of a party "should be reduced." Act of Apr. 15, 1949, ch. 253, § 1, 1949 Tenn. Pub. Acts 849-50. Despite the broad language of the statute, in *Smith v. Shelton*, 569 S.W.2d 421 (Tenn. 1978), the Court held that a trial judge was permitted to reduce or increase a jury award only when the verdict was outside the lower or upper range of reasonableness established by the credible proof. *Id.* at 427.

Subsequent decisions retreated from the *Shelton* Court's restrictive view of the trial court's authority. In *Ellis*, the Court clarified that "when remittitur is the issue[,] . . . the question is whether the amount of money awarded is excessive, which requires ascertainment of a figure that represents the point at which excessiveness begins." *603 S.W.2d at 126*; *see also Meals*, 417 S.W.3d at 421. The next year, the Court modified its previous ruling in *Shelton* to clarify that a trial judge may suggest an adjustment in a jury verdict even when the amount of the verdict is within the range of reasonableness, as an alternative to granting a new trial, if the trial judge is of the opinion that the jury verdict is not adequate. *Foster*, 621 S.W.2d at 147 (citing Tenn. Code Ann. § 20-10-101, -102).

35

*Foster* noted that the restriction on the trial court's authority in *Shelton* contradicted the language and intent of the additur statute.[23] *Id.*

The current remittitur statute, Tennessee Code Annotated section 20-10-102, sets forth the procedure for a trial court's suggestion of remittitur. In doing so, it refers to the trial court's authority to suggest a remittitur "when the trial judge is of the opinion that the verdict in favor of a party should be reduced. . . ." Tenn. Code Ann. § 20-10-102(a). In 1987, the legislature added the following language to subsection (b) of that statute: "The court of appeals shall review the action of the trial court suggesting a remittitur using the standard of review provided for in T.R.A.P. 13(d) applicable to decisions of the trial court sitting without a jury." Tenn. Code Ann. § 20-10-102(b). The provision in Rule 13(d) of the Tennessee Rules of Appellate Procedure to which section 20-10-102(b) refers states: "[R]eview of findings of fact by the trial court in civil actions shall be de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). Taken altogether, these indicate that the legislature intended for trial courts to have the authority to grant remittitur if the trial judge finds that the evidence preponderates in favor of a lower amount of damages than the jury awarded.

Thus, over time, trial courts have acquired broader authority to suggest a remittitur. A trial court is no longer required to find that the amount of a jury's verdict is so excessive as to indicate passion, prejudice, corruption, or caprice on the part of the jury. A trial judge may suggest an adjustment in a jury verdict even when the amount of the verdict is within the range of reasonableness, i.e., is supported by material evidence in the record. After seeing the witnesses and observing their demeanor, the trial court is "to independently weigh the evidence, pass upon the issues, and decide whether the verdict is supported by the evidence." *Moats*, 906 S.W.2d at 433. After making his own independent assessment of the witnesses' credibility, if the trial judge finds that the evidence preponderates in favor of a lower amount of damages, the trial judge may suggest remittitur instead of granting a new trial.

Concomitantly, under section 20-10-102(b), the standard of appellate review for a *trial court's* suggestion of remittitur requires the appellate court to ascertain whether the trial judge's reduction of the jury award is supported by a preponderance of the evidence.[24]

---

[23] "[T]he standards governing an additur and remittitur are analogous." *Coffey*, 929 S.W.2d at 331 n.1 (citing *Foster*, 621 S.W.2d at 143 n.2).

[24] As noted previously, the dissent includes a generalized discussion of the standards for appellate review of remittitur by both a trial court and by an appellate court and standards for an appellate court to make its own suggestion of remittitur. However, at the end of the day, the dissent and the majority appear to agree on the standard for appellate review of a jury verdict that has been approved by the trial court (material evidence), appellate review of a trial court's remittitur of a jury award (preponderance of the

In applying the preponderance of the evidence standard to its review of the trial court's suggested remittitur, we note that the appellate court must "giv[e] due credit to the jury's decision on the credibility of the witnesses and that of the trial judge in his capacity as thirteenth juror." *Foster*, 621 S.W.2d at 145. As discussed *infra*, this directive can prove to be a challenge in some cases.

Applying this standard of review, in *Long v. Mattingly*, then-Judge Koch offered "a three-step review of a trial court's adjustment of a jury's damage award." *Long v. Mattingly*, 797 S.W.2d 889, 896 (Tenn. Ct. App. 1990). The suggested framework consisted of the following:

> First, we examine the reasons for the trial court's action since adjustments are proper only when the court disagrees with the amount of the verdict. Second, we examine the amount of the suggested adjustment since adjustments that totally destroy the jury's verdict are impermissible. Third, we review the proof of damages to determine whether the evidence preponderates against the trial court's adjustment.

*Id*. (citations and internal quotation marks omitted). We adopt the *Long v. Mattingly* three-prong framework for appellate review of a trial court's suggested remittitur.

The primary purpose of the first *Long v. Mattingly* prong, looking at the trial court's stated reasons for the adjustment, is to determine whether the trial court "disagreed with other than the amount of the verdict." *Burlison v. Rose*, 701 S.W.2d 609, 611 (Tenn. 1985). While the trial court's denial of the motion for new trial is some indication that the trial judge agreed with the jury as to the defendant's liability, we look at the trial court's actions overall to determine whether "the trial judge disagreed with the facts as found by the jury." *Id*.

The second prong requires the appellate court to determine whether the trial court's suggested additur or remittitur "totally destroys" the jury's verdict. *Long*, 797 S.W.2d at 896. In making this determination, there is no set mathematical formula or percentage to use. *Meals*, 417 S.W.3d at 420 n.8. Appellate courts have at times looked at whether the additur or remittitur "would result in an award not only proportionally different from the jury verdict but also substantially different in absolute terms." *Bonner*, 2014 WL 6873058, at *7 (quoting *Phillips v. Perot*, No. 02A01-9704-CV-00094, 1998 WL 117325, *4 (Tenn. Ct. App. Mar. 17, 1998) (Lanier, Sp. J., concurring)).

---

evidence under Tenn. Code Ann. § 20-10-102(b)), and the standard for an appellate court to suggest its own remittitur where the trial court has approved the jury's award (material evidence under *Meals*, 417 S.W.3d at 422-23). The only point of disagreement on remittitur standards appears to be the standard for an appellate court to suggest its own further remittitur where the trial court has already suggested a remittitur, discussed above.

For the third prong of the three-step review, we look at the proof to ascertain whether the evidence preponderates against the trial court's additur or remittitur. As noted above, this prong requires us to defer to the jury's decision on the credibility of the witnesses and also to "that of the trial judge in his capacity as thirteenth juror." *Foster*, 621 S.W.2d at 145.

As we segue into applying this three-step framework to review the trial court's suggestion of remittitur in this case, we immediately encounter an obstacle. The first step is to "examine the reasons for the trial court's action." *Long*, 797 S.W.2d at 896. In this case, to explain the decision to grant remittitur, the trial court's Order Denying Defendant Celadon Trucking Services Inc.'s Motion for New Trial and Granting Remittitur states only the following: "[W]hile this Court makes no specific determination that this jury acted with passion, prejudice or caprice, it is ruled that the award given following the trial of this matter was excessive and remittitur is appropriate." The order then sets forth the specific amounts by which the trial court reduced each element of the damage award. Thus, to explain its substantial suggested remittitur of the jury's verdict, the trial court stated only that the jury's award was "excessive" and remittitur was "appropriate." This offers virtually no insight into the reasons for the trial court's decision.

Faced with similar circumstances, the Court of Appeals has at times wondered aloud how to examine the reason for a remittitur in a case in which the trial court gave no reason for it. For example:

> Our ability to [assess the trial court's reason for suggesting a remittitur] is confounded by the manner in which the trial court suggested the remittitur. . . . [B]oth the letter ruling and the written order on the suggestion of remittitur stated only the trial court's conclusion that "the judgment in favor of [Johnson] is excessive, is not supported by the proof, and should be reduced." No explanation for this conclusion was given. Though we are charged on appeal with the responsibility to "examine the reasons for the trial court's actions," we are left perplexed as to how this can be done in this case. *Long*, 797 S.W.2d at 896. . . . We soldier on.

*Johnson v. Nunis*, 383 S.W.3d 122, 135 (Tenn. Ct. App. 2012) (citation omitted); *see also Adams v. Leamon*, No. E2012-01520-COA-R3-CV, 2013 WL 6198306, at *3 (Tenn. Ct. App. Nov. 25, 2013) ("[T]he trial court's only stated reasons for suggesting a remittitur for the two categories of damages reduced were that the jury's award was 'excessive' and 'not supported by the evidence.' . . . [W]here the trial court does not give any actual explanation for its action, '[t]hough we are charged on appeal with the responsibility to 'examine the reasons for the trial court's actions,' we are left perplexed as to how this can be done in this case.'" (quoting *Johnson*, 383 S.W.3d at 135)).

38

A trial court's failure to provide reasons for its suggestion of remittitur can also affect the appellate court's ability to apply the third prong of the *Long v. Mattingly* framework, the review of the proof to determine whether the evidence preponderates against the trial court's adjustment. This prong requires the appellate court to evaluate the preponderance of the evidence, giving proper deference to both the jury and to the trial judge in his capacity as thirteenth juror. As this Court has noted, when the trial court weighs the evidence in his capacity as thirteenth juror, this can include an independent evaluation of the credibility of the witnesses:

> Weight and credibility, therefore, are inextricably linked. The weight of a witness' testimony decreases as attacks on his or her credibility succeed. As the Supreme Court of Ohio has recognized,
>
>> Weight of the evidence concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.

*State v. Ellis*, 453 S.W.3d 889, 900 (Tenn. 2015) (quoting *Ohio v. Thompkins*, 678 N.E.2d 541, 546 (Ohio 1997) (emphasis and internal quotation marks omitted)). Therefore, if the evidence regarding damages was conflicting and required both the jury and the trial court sitting as thirteenth juror to assess the credibility of the witnesses, a trial court's failure to explain the basis for its suggestion of remittitur may leave the appellate court in the dark as to whether, or how, the trial court's view of the credibility of the witnesses may have differed from that of the jury.

In some cases, the lack of this information may not appreciably hamper the appellate court's ability to review the trial court's remittitur decision. For example, in *Bain v. Simpson*, the expert testimony that formed the basis for the damage award was essentially uncontradicted, so the appellate court was able to ascertain that the evidence preponderated against the trial court's remittitur even in the absence of any explanation from the trial court on the reasons for the remittitur. *Bain v. Simpson*, No. M2001-00088-COA-R3-CV, 2002 WL 360320, at *3-4 (Tenn. Ct. App. Mar. 7, 2002); *see also Bonner*, 2014 WL 6873058, at *10 (determining that evidence did not preponderate against trial court's additur despite lack of explanation of trial court's reasons when plaintiff's testimony on pain and discomfort was uncontradicted).

39

In other cases, the lack of explanation of the reasons for the trial court's remittitur has left the appellate court at a loss as to how to consider the trial court's credibility determinations along with those of the jury. For example:

> We do not know whether the trial court disagreed with some of the jury's credibility determinations, whether it perceived an absence of evidence on one or more of the itemized awards, or had some other reason for its suggested remittitur. While we are to defer to the trial court in its role as thirteenth juror, the absence of any specifics gives us little to which we may defer.

> [Defendant] argues energetically that we should surmise that the trial court based its suggestion of remittitur on alleged lack of evidence of permanent impairment or past or future lost wages. We decline to guess at the trial court's reasons for its decision. Instead, we will review the evidence as to each of the itemized damage verdicts, giving full deference to the jury's credibility determinations, since the jury's credibility assessment is the only one we have.

*Johnson*, 383 S.W.3d at 135-36. Thus, in the absence of any stated reasons for the trial court's suggestion of remittitur, the appellate court in *Johnson* was left unable to defer to the trial judge's independent evaluation of the witnesses, and thus unable to conduct a proper appellate review of the preponderance of the evidence.

If the trial court's authority to suggest remittitur were limited to situations in which the jury's award exceeds the range of reasonableness, explanation of the reasons for the remittitur would rarely be needed; the appellate court could simply review the record and assume credibility determinations that favor the award, in the same way that an appellate court reviews a jury verdict. However, because trial courts now have expanded authority to suggest remittitur based on the preponderance of the evidence, they also have the responsibility to explain the reasons for a remittitur. This is necessary to give the appellate court the baseline information needed to determine whether the evidence preponderates against the remittitur. In some cases, the appellate court will be able to review the remittitur decision even in the absence of any meaningful insight into the trial court's reasons for reducing the jury's award. In other cases, particularly where there is sharply conflicting evidence regarding damages, an appellate court's decision to "soldier on" in the absence of an explanation of the basis of the trial court's suggested remittitur may effectively deprive the parties of meaningful appellate review. Where credibility is a significant issue, deference to the trial court as thirteenth juror may not be possible without some idea of whether or in what regard the trial court's assessment of the witnesses' credibility differed from that of the jury. Under these circumstances, the appellate court may be left unable to review the evidence to determine whether it preponderates against the suggested remittitur. *See Ellis*, 453 S.W.3d at 900 ("Weight

and credibility, therefore, are inextricably linked."). In such cases, the appellate court has the option of remanding the case to the trial court for a proper explanation of the reasons for the suggested remittitur, including the trial court's assessment of the credibility of witnesses whose testimony was pertinent to the damage award.[25]

As noted above, in the instant case, the trial court's order offered essentially no explanation for its decision to suggest remittitur in every category of damages awarded by the jury. We consider, then, whether our review of the remittitur decision in this case is so hampered by the trial court's failure to include in the record any explanation of the basis of the remittitur that we must remand. To make this determination, we examine the testimony presented by the parties.

In the trial court, the parties offered testimony from competing neurologists about Mr. Borne's physical condition. On behalf of Mr. Borne, neurologist Donald Dietze testified that Mr. Borne suffered a permanent musculoskeletal injury, namely, accelerated degeneration of Mr. Borne's L4-5 disc resulting from injury in the July 1, 2009 accident. Dr. Dietze relied in part on the opinions of radiologist Dr. Glorioso, who read Mr. Borne's MRI films; Dr. Dietze also read the MRI films but basically agreed with Dr. Glorioso and so did not add his own comments to the report. Dr. Dietze conceded that he was not aware that Mr. Borne had been in a June 2009 traffic accident; in addition, Dr. Dietze was not told of Mr. Borne's April 2011 traffic accident during Mr. Borne's May 4, 2011 appointment but learned about it later. Dr. Dietze acknowledged that Mr. Borne's 2011 accident could have produced sufficient trauma to account for the accelerated degeneration of Mr. Borne's disc after the July 2009 accident. Dr. Dietze referred Mr. Borne to physical therapist Courtney Roberts for a functional capacity evaluation. After her first evaluation, Dr. Roberts felt that Mr. Borne could not even do sedentary work, but by the time of trial she believed that he could probably do sedentary work. Based on his own evaluation and that of Dr. Roberts, Dr. Dietze opined that Mr. Borne should not return to work because he could only perform sedentary work activities.

Mr. Borne also presented testimony from radiologist Lawrence Glorioso, who read the MRI films on which Dr. Dietz relied. Dr. Glorioso opined that Mr. Borne suffered an annular fibrosis tear, a disc herniation at the L4-5 level, bulging discs at the L2-3 and L3-4 levels, and signs of facet arthrosis, which is consistent with a degenerative spinal

---

[25] The trial court's explanation of its reasons for suggesting a remittitur need not be overly detailed in order to give the appellate court sufficient information to conduct appellate review of the remittitur decision. See, for example, *Glover v. Chambers*, No. C.A. 56, 1988 WL 5681 (Tenn. Ct. App. Jan. 29, 1988), in which the appellate court indicated that its appellate review of the trial court's suggestion of remittitur was "assisted" by a trial court order in which the trial judge "set[] forth his reasons for his action and the evidence upon which he based his conclusion." *Glover*, 1988 WL 5681, at *5. The appellate court noted that the trial judge "predicated the remittitur on two findings" and briefly described the findings and evidence referenced in the trial court's order. *Id.* Thus, requiring the trial court to state the reasons for its remittitur decision is not an onerous requirement.

problem. Dr. Glorioso described his findings as consistent with a traumatic event, and he said that he did not think Mr. Borne's spinal condition resulted from chronic spine problems.

To counter the testimony of neurologist Dr. Dietze and radiologist Dr. Glorioso, Celadon offered the testimony of neurosurgeon Robert Applebaum. Dr. Applebaum examined Mr. Borne and reviewed his medical records, including the MRI films read by Dr. Glorioso. Dr. Applebaum explained that he typically reviews MRI films because "frequently I don't necessarily agree with radiologists." After examining Mr. Borne and his medical records, Dr. Applebaum concluded that Mr. Borne likely had no disease or damage involving his spinal cord or nerve roots and that there were no significant neck or back mechanical or neurological findings. Dr. Applebaum noted a moderate disc bulge at the L4-5 level but felt that it was not clinically significant. Dr. Applebaum concluded that Mr. Borne could return to work in any occupation for which he was qualified.

The parties also offered conflicting testimony regarding whether the July 1, 2009 accident caused the injuries of which Mr. Borne complained. In the accident, Mr. Borne's tractor trailer had come to a stop and was rear-ended by Celadon's tractor trailer. In his testimony, Mr. Borne described the collision as a hard impact that caused the hood of his tractor trailer to pop open and significantly damaged the front of the Celadon tractor trailer. He also described in detail the physical symptoms that ensued. Mr. Borne acknowledged that he was involved in a traffic accident on June 18, 2009, before his collision with the Celadon tractor trailer, and another nearly two years later, in April 2011. The June 2009 incident caused Mr. Borne to go to the hospital with neck pain and to miss a week of work, and the April 2011 accident generated enough force to break the other vehicle's back window, dent the rear of the other vehicle, and dent the front of Mr. Borne's vehicle. Mr. Borne said that when he disclosed the April 2011 accident to physical therapist Courtney Roberts, he told her that no one was injured in the accident.

Celadon put on testimony from Talmadge Mevers, a passenger in Mr. Borne's vehicle, and Harold Foster, the driver of the Celadon tractor trailer. Mr. Mevers described the impact as a "pretty good little pound" and "a pretty good little hit." In contrast, Mr. Foster said that, when his Celadon tractor trailer made contact with the rear of Mr. Borne's vehicle, "I didn't hardly feel anything. . . ."

Celadon also presented testimony from Douglas Morr, a biomechanical engineer who conducted an accident reconstruction analysis of the July 2009 accident. Mr. Morr concluded that the force and acceleration of the July 2009 accident were not consistent with the cervical or lumbar injuries that Mr. Borne claimed that he sustained in the accident.

Finally, the parties presented conflicting testimony regarding Mr. Borne's future vocational prospects. On behalf of Mr. Borne, behavioral health and rehabilitation

counselor Greg Cates opined that Mr. Borne is unemployable if he cannot perform sedentary work. If Mr. Borne can perform sedentary work, Dr. Cates said, he would experience a 95% to 99% loss of vocational opportunity, and if Mr. Borne can do light-duty work, then he would experience a 93% loss of vocational opportunity. Dr. Cates felt that Mr. Borne's three-year absence from work because of his injury would make it extremely difficult for Mr. Borne to secure employment.

Vocational analyst Anthony Gamboa also testified on behalf of Mr. Borne. Dr. Gamboa based his vocational economic analysis on Dr. Dietze's medical reports. He also based his opinion on Dr. Roberts' functional capacity evaluation but acknowledged that he was not aware of Mr. Borne's improved condition after the physical therapy with Dr. Roberts. Like Dr. Cates, Dr. Gamboa felt that Mr. Borne's three-year absence from work would greatly impact his ability to secure future employment. Dr. Gamboa opined that Mr. Borne could perform only about 2% of jobs in the labor market, that he had a very small chance of obtaining one of these jobs, and that he probably could not return to work. Based on these opinions, Dr. Gamboa calculated the value of the loss of Mr. Borne's earning capacity to be $1,334,647.

Celadon presented contrary testimony from certified rehabilitation counselor Carla Seyler. Ms. Seyler performed a vocational rehabilitation exam on Mr. Borne. She interviewed Mr. Borne and reviewed his work history, educational history, discovery responses, and did vocational testing. She reviewed Mr. Borne's medical records, including those of Dr. Dietze and Dr. Applebaum, as well as the records of physical therapist Dr. Roberts. She interpreted the records of Dr. Diteze and Dr. Roberts as indicating that Mr. Borne could perform sedentary to light-duty work, and she interpreted Dr. Applebaum's records as indicating that Mr. Borne could return to his regular work with no restrictions. Under either physical evaluation, Ms. Seyler opined that Mr. Borne would be able to secure a job compatible with his education, work history, and physical restrictions and that he would be able to replace his income prior to the July 2009 accident. To overcome the three-year gap in his work history, Ms. Seyler suggested he spend a period of time working short-term jobs for a temporary service, to get back into the workforce. After a period of transition, Ms. Seyler opined, Mr. Borne would be able to secure a job making an amount of money that would equal or exceed what he was making at the time of the accident.

As can be seen, the parties presented sharply contrasting testimony. The testimony conflicted regarding Mr. Borne's physical condition, the degree to which his injuries were caused by the July 2009 accident, whether Mr. Borne could secure employment, and, if so, whether such employment would provide earnings equal to what he was making prior to the accident.

As noted above, the jury awarded Mr. Borne $1,455,000 for loss of earning capacity, $750,000 for physical pain and mental suffering, $750,000 for permanent

injury, and $750,000 for loss of enjoyment of life. These awards indicate that the jury credited the testimony of Mr. Borne's witnesses and did not credit the testimony of the witnesses presented by Celadon.

The trial judge suggested remittitur of the jury's award down to the following amounts: $1,100,000 for loss of earning capacity, $500,000 for physical pain and mental suffering, $100,000 for permanent injury, and $400,000 for loss of enjoyment of life. Each of these categories of damages would be affected to some extent by the perceived credibility of the witnesses who testified regarding Mr. Borne's physical condition, the degree to which his injuries were caused by the July 2009 accident, whether Mr. Borne will be able to find suitable employment in the future and, if so, whether that employment will pay an amount equal to what he was making prior to the accident.

"Deciding whether there are inconsistencies in testimony, reconciling conflicts in testimony, and how this might affect a witness's credibility, are all within the province" of both the jury and the trial judge sitting as thirteenth juror. *State v. Hornsby*, 858 S.W.2d 892, 895 (Tenn. 1993). Sitting as thirteenth juror, the trial court is "free to believe or disbelieve all or part or none of a witnesses' testimony, even where the testimony is uncontradicted or is not directly impeached." *Cornell v. State*, 118 S.W.3d 374, 378 (Tenn. Ct. App. 2003). From the record in this case, without resorting to sheer speculation, we have no way to determine whether the trial court's suggested remittitur stemmed from disagreement with the jury regarding the credibility of the testimony on Mr. Borne's physical condition, the degree to which his injuries were caused by the July 2009 accident, whether Mr. Borne will be able to secure employment in the future, the likely amount of compensation Mr. Borne would be able to earn if he succeeds in finding a job, or whether the trial court's disagreement with the jury was based on some other factor entirely. In short, we are left unable to review where the preponderance of the evidence lies, "giving due credit to the jury's decision on the credibility of the witnesses and that of the trial judge in his capacity as thirteenth juror." *Foster*, 621 S.W.2d at 145.

Under these circumstances, we are left little choice but to remand the case to the trial court for an explanation of its reasons for suggesting remittitur in this case to enable the appellate court to conduct a proper appellate review of the trial court's remittitur decision. The trial court's explanation need not be exhaustive, but it should indicate the areas in which it disagreed with the jury, including disagreement with any factual findings underlying the jury's verdict or with testimony apparently credited by the jury.[26]

---

[26] The dissent disagrees with our decision to remand the case to the trial court for an explanation of its reasons for suggesting remittitur. The dissent asserts that the trial court's description of the overall verdict as "excessive" is "sufficient for appellate review." In its review of the trial court's suggested remittitur, however, it is clear that the dissent simply makes *its own* assessment of the witnesses' credibility, instead of assessing the preponderance of the evidence in light of the trial court's independent credibility determinations.

For this reason, we must also vacate the Court of Appeals' decision to reverse the trial court's remittitur of the jury's award for lost earning capacity. As is the case for this Court, the Court of Appeals had no explanation of the trial court's reasons for its suggestion of remittitur, so it did not have enough information to perform a meaningful review of the trial court's decision to suggest a remittitur of the award for lost earning capacity.[27]

For example, the dissent credits entirely the testimony of Dr. Gamboa regarding Mr. Borne's loss of earning capacity and would reverse the trial court's remittitur of this award. In taking this position, the dissent comments only that "Celadon disputed Dr. Gamboa's testimony but presented no evidence suggesting an alternative, lower dollar figure." But Celadon was entitled to rebut Mr. Borne's proof on damages by *discrediting* Dr. Gamboa's testimony; it did not have to put on its own evidence of a lower dollar figure in order to argue to the jury that the figures to which Dr. Gamboa testified were inflated. Moreover, the evidence Celadon used to undermine the basis for Dr. Gamboa's testimony was substantial. As outlined above, Dr. Gamboa based his vocational economic assessment on Dr. Dietze's medical reports. But Dr. Dietze's medical assessment was undermined considerably by the fact that he was unaware that Mr. Borne had been in a June 2009 traffic accident and was not told about Mr. Borne's April 2011 accident until long after it happened, despite the fact that Mr. Borne presented to Dr. Dietze a few weeks after the April 2011 accident complaining of recent increased pain. Importantly, as noted below, Dr. Dietze's evaluation—the basis for Dr. Gamboa's expert testimony—did not factor in the significant improvement in Mr. Borne's functionality from his physical therapy with Dr. Roberts. Thus, in advocating a reversal of the trial court's remittitur of the jury award for loss of earning capacity, it is apparent that the dissent simply chooses to disregard the evidence that contravenes Dr. Gamboa's expert testimony. In other words, the dissent would reverse based on its *own* credibility determinations.

The dissent makes similar credibility assessments as part of its evaluation of the trial court's suggested remittitur on the remaining awards. This is contrary to the role of an appellate court in reviewing a trial court's suggested remittitur; our role is limited to respecting the *trial court's* independent credibility determinations and reviewing the preponderance of the evidence in light of them.

The dissent objects to a remand in light of the time that has passed since the accident involving Mr. Borne and the Celadon truck. The length of time is unfortunate indeed. However, after lengthy review of the record, without resorting to speculation about the reasons for the trial court's suggested remittitur, we are unable to perform the meaningful appellate review to which the parties are entitled. Under these circumstances, the trial court's failure to place in the record the reasons for its suggested remittitur necessitates a remand.

[27] We note that the Court of Appeals restored the award for lost earning capacity to the original amount awarded by the jury, $1,455,000. Whether there is even *material* evidence in the record to support this award is questionable. As Mr. Borne admits, the expert whose testimony forms the basis for this award, Dr. Gamboa, testified to a total amount of $1,334,647, less than the amount awarded by the jury. Moreover, Dr. Gamboa conceded that the $1,334,647 figure was based on Dr. Roberts' functional capacity evaluation, performed *before* Mr. Borne's successful physical therapy with her and without knowledge of the resulting improvement in Mr. Borne's functionality. In her trial testimony, based on her observations of Mr. Borne during physical therapy, it was Dr. Roberts' opinion that Mr. Borne has improved to the point that he could probably perform sedentary work. Dr. Gamboa's economic analysis was also based on Dr. Dietze's medical records, including Dr. Dietze's evaluation that likewise did not factor in the improvement in Mr. Borne's functionality resulting from the physical therapy with Dr. Roberts. At trial, Dr. Dietze acknowledged that the physical therapist had documented improved strength and functionality and then said, "I do think he could at least meet the sedentary, and I would say light—

In sum, we decline to grant the relief requested by the defendant Celadon arising out of the pretrial agreement between Mr. Borne and Chickasaw, including the trial court's failure to invalidate the agreement, its failure to enter the agreement into evidence, its failure to strike the jury panel, and its decision not to give Celadon's requested jury instruction regarding the agreement. We also hold that the trial court did not err in declining to give a jury instruction on superseding cause. Therefore, we affirm the decision of the Court of Appeals regarding the challenges to the agreement and the trial court's denial of a superseding cause instruction. Absent a finding that the jury's award—as remitted by the trial court—exceeds the uppermost boundary of the range of reasonableness, we hold that the Court of Appeals had no authority to suggest a further remittitur, and so we reverse the remittitur of the award for loss of enjoyment of life suggested by the Court of Appeals. As to the trial court's remittitur, the proof on the plaintiff's damages was conflicting, and resolution of the issues regarding damages depended upon an assessment of the witnesses' credibility by the jury and also by the trial court sitting as thirteenth juror. Under these circumstances, the trial court's failure to indicate its reasons for suggesting a remittitur leaves us unable to engage in a meaningful review of the trial court's remittitur decision. Therefore, we remand the case to the trial court for explanation of its reasons for suggesting remittitur of the jury's award. Because the Court of Appeals was likewise without sufficient information to perform a meaningful review of the trial court's remittitur, we vacate the Court of Appeals' decision to reverse the trial court's remittitur of the award for lost earning capacity.

---

possible light duty, somewhere in that range." In his trial testimony, Dr. Gamboa testified that, if it is assumed that Mr. Borne can perform light-duty or sedentary work, then the vocational economic assessment "would be done in a very, very different way" and Mr. Borne's loss of earning capacity would be less than the $1,334,647 figure to which he had testified. However, because we have vacated the Court of Appeals' decision to restore the jury award on lost earning capacity and we are remanding the case to the trial court, we need not resolve the question of material evidence to support the award for lost earning capacity at this juncture.

Accordingly, the decision of the Court of Appeals is affirmed in part, reversed in part, and vacated in part, as set forth above, and the case is remanded to the trial court for further proceedings. Costs of this appeal are taxed to Celadon Trucking Services, Inc., and its surety, for which execution may issue if necessary.

_____
HOLLY KIRBY, JUSTICE